UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                                      CASE NO: 2:14-cr-46-FtM-38MRM

DONNIE DERUITER
_____/

## REPORT AND RECOMMENDATION

## TO THE UNITED STATES DISTRICT COURT

This cause is before the Court on Defendant Donnie Deruiter's Motion for Hearing to Determine Competency (Doc. 23) filed on November 26, 2014.  Defendant attached an evaluation by Dr. Robert Ouaou, Ph.D. and Dr. Ouaou's *curriculum vita* to the motion.  (Doc. 23-1 and 23-2).  On December 10, 2014, United States Magistrate Judge Douglas Frazier held a hearing on Defendant's Motion.  The next day, on December 11, 2014, the Court found that there was reasonable cause to believe that "Defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense pursuant to 18 U.S.C. §§ 4241 and 4247."  (Doc. 29 at 1).  Based on that finding, the Court ordered a psychological evaluation of Defendant.  (*Id.* at 1 ¶ 1).

Dr. Rodolfo Buigas, Ph.D. evaluated Defendant at the Federal Bureau of Prisons ("BOP") Federal Detention Center in Miami, Florida ("FDC Miami").  Dr. Buigas' report, dated April 2, 2015, is filed with the Court under seal.  (Doc. 59).  After this report was filed, the parties engaged in reciprocal discovery.  (*See* Docs. 36, 54, 58, and 64).

The Court set a competency hearing for October 29, 2015.  Dr. Ouaou and Dr. Buigas testified at the hearing.  Defendant was present for the hearing.  Based on the testimony of the

experts at the hearing and the information contained in the experts' reports, the Court concludes that Defendant is competent and recommends that the case should proceed to trial. The Court also recommends certain accommodations that would aid Defendant in consulting with his lawyers and assisting properly with his defense at trial.

### I.     Written Forensic Evaluations of Defendant

As indicated above, two forensic evaluations have been filed in this case regarding Defendant's competency. The Court first addresses the report of Dr. Ouaou. The Court then discusses Dr. Buigas' report.

#### a.   Forensic Neuropsychological Evaluation by Dr. Robert Ouaou, Ph.D.

Dr. Ouaou completed a Forensic Neuropsychological Evaluation of Defendant and issued a report dated November 25, 2014. (Doc. 23-1 at 1). The report indicates that Dr. Ouaou examined Defendant on August 24, 2014 and November 11, 2014. (*Id.*). Defendant Deruiter underwent several hours of neuropsychological assessment as part of the evaluation. (*Id.*). In conducting the evaluation, Defendant was evaluated in a private room, free from visual or auditory distractions. (*Id.*).

Dr. Ouaou reviewed records of Defendant and took a relevant history. (*Id.* at 1-2). Defendant stated to Dr. Ouaou that he had been arrested for possession of child pornography. (*Id.* at 2). Defendant indicated that he was living at his parents' house at the time of arrest and that law enforcement had taken several computers and DVDs from his home. (*Id.*). Dr. Ouaou noted that Defendant "was extremely restless and tangential during the examination and had difficulties staying on topic." (*Id.*). Additionally, Defendant reportedly had trouble in providing exact dates and other details related to his arrest. (*Id.*). Defendant did, however, understand that he could serve prison time if convicted. (*Id.*). Moreover, Dr. Ouaou reported that Defendant has

"frank impairments in attention and concentration.  Throughout the examination he was tangential and circumstantial, and had significant difficulties staying on task.  His mood is depressed and anxious.  He demonstrated severe psychomotor hyperactivity.  Many of the procedures required multiple explanations secondary to his difficulties maintaining attention and apparent comprehension defects."  (*Id.*).

Defendant's past reported medical history did not include any known systemic medical diseases, but Dr. Ouaou reported a history of "multiple head injuries stemming from childhood that have resulted in a loss of consciousness."  (*Id.*).  The first head injury reportedly occurred when Defendant fell out of a two-story window as an infant.  (*Id.*).  Defendant presented with a frontal facial scar.  (*Id.*).

Additionally, according to records reviewed by Dr. Ouaou, Defendant's parents abused alcohol and drugs.  (*Id.*).  Defendant was abandoned when he was three weeks old, and his father reportedly died of a drug overdose when Defendant was nine years old.  (*Id.*).  Defendant was raised by his paternal grandmother, and he spent time in and out of foster care.  (*Id.* at 3).  Defendant reported a history of physical abuse.  (*Id.*).  Defendant took special classes as a child and completed eight years of formal education.  (*Id.*).  Defendant reported difficulties functioning in the classroom because of his poor attention and hyperactivity.  (*Id.*).

The report described a "chronic history of attention problems, hyperactivity, and impulsivity."  (*Id.* at 2).  Defendant's records described him as "emotionally disturbed, extremely restless, and hyperactive."  (*Id.*).  Dr. Ouaou wrote that, "[d]espite these symptoms, he has had little psychiatric treatment in the past."  (*Id.*).  Dr. Ouaou reported a history of chronic substance abuse.  (*Id.*).  Prior to his arrest, Defendant was prescribed Adderall, an Attention Deficit

Hyperactivity Disorder ("ADHD") medication reportedly effective in treating cognitive and motor defects. (*Id.*).

The report indicated that Dr. Ouaou administered a battery of neuropsychological tests on Defendant. (*Id.* at 3). This battery of tests examined Defendant in four areas: (1) Symptom Validity and Malingering, (2) Intellectual Functioning, (3) Cognitive Functions, and (4) Learning and Memory. (*Id.* at 3-5).

First, as to Symptom Validity and Malingering, Dr. Ouaou noted that there is a possibility that an accused person may attempt to exaggerate his or her impairments. (*Id.*). To determine validity of the procedure, Dr. Ouaou administered tests designed to reveal "less than genuine performance on the part of the test subject." (*Id.*). Dr. Ouaou wrote that "[o]n multiple tests of effort and motivation . . . the [Defendant] performed within normal limits. Thus, the current evaluation is considered to be a valid profile of the [Defendant's] neuropsychological functioning." (*Id.*).

Second, as to Intellectual Functioning, Dr. Ouaou administered tests to determine Defendant's intelligence quotient ("IQ"). (*Id.*). Dr. Ouaou first described the results of the Test of Premorbid Functioning ("TOPF"). The TOPF is a test designed to estimate an individual's intellectual ability prior to a neurological disease or injury. (*Id.*). Defendant scored in the average range, receiving a standard score of 98. (*Id.*).

Dr. Ouaou's report next discussed Defendant's results on the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), an IQ test. (*Id.* at 3-4). Dr. Ouaou explained that the "Full Scale IQ is the aggregate of the index scores and is usually considered to be the most representative measure of global intellectual functioning." (*Id.* at 4). Defendant scored an 82 on the WAIS-IV Full Scale IQ test (*Id.* at 3), indicating that Defendant's general cognitive ability is

in the low average range and that Defendant's overall thinking and reasoning abilities exceed only approximately 12% of adults his age.  (*Id.* at 4).  The WAIS-IV test also measures Defendant's Verbal Comprehension and Perceptual Reasoning.  (*Id.*).  For Verbal Comprehension, Defendant scored an 85, placing his verbal reasoning abilities in the low average range, above approximately 16% of his peers.  (*Id.*).  As to Perceptual Reasoning, Defendant scored a 94, placing him in the average range above approximately 34% of his peers. (*Id.*).

The third area of test results address Defendant's Cognitive Function, specifically Attention and Concentration.  (*Id.*).  This section of results measures four subparts including: (i) Immediate Memory Span; (ii) Focused and Flexible Attention; (iii) Processing Speed; and (iv) Working Memory.

As to Immediate Memory Span, Defendant demonstrated impaired performance.  (*Id.*). Dr. Ouaou reported that Defendant was able to repeat "up to 7 digits forward on the WAIS-IV Digit Span, which is in the average range."  (*Id.*).  However, Defendant's recall of initial words on the California Verbal Learning Test-II ("CVLT-II") placed Defendant in the severely impaired range relative to age-matched peers.  (*Id.*).  Defendant's recall of a second interference list was in the impaired range.  (*Id.*).

Focused and Flexible Attention measures "[c]ompletion time for tasks requiring motor speed, sequencing, and visual search . . . ."  (*Id.*).  Here, Defendant's scores ranged from average to mildly impaired.  (*Id.*).  However, when tasks were made more complex by requiring alternating cognitive sets, Defendant performed in the low average range.  (*Id.* at 4-5).

As to Processing Speed, Defendant's score of 68 placed him in the severely impaired range, above only 2% of people his age.  (*Id.* at 5).

Working Memory measures an "individual's ability to hold information temporarily in memory for the purpose of using that information to perform a specific task." (*Id.*). Dr. Ouaou stated that "[w]orking memory (*i.e.*, a higher level attentional ability) is an important prerequisite of many cognitive abilities such that inadequate working memory skills will likely affect an individual's ability to perform other mental operations efficiently." (*Id.*). Defendant scored a 95, placing him within the average range on the WAIS-IV. (*Id.*). Finally, the report states that Defendant was able to repeat a maximum of 3 digits backwards, placing him in the impaired range relative to age-matched peers. (*Id.*).

The final section of test results address Learning and Memory. (*Id.*). Within this section, five discrete subparts are discussed in Dr. Ouaou's report: (i) Acquisition of New Information; (ii) Recall; (iii) Recognition; (iv) Spatial Analysis/Synthesis; and (v) Reasoning/Problem Solving/Executive Function.

 As to Acquisition of New Information, Defendant's score on CVLT-II testing placed him in the severely impaired range compared to age matched peers. (*Id.*). Additionally, figure learning testing from the Wechsler Memory Scale-IV ("WMS-IV") test indicated that Defendant scored in the low average range. (*Id.*).

As to Recall, Defendant's scores placed him in the severely impaired range for word-list recall. (*Id.*). Defendant's performance was equally impaired for short-delayed cued recall and long-delayed recall. (*Id.*). Figure recall from the WMS-IV test placed Defendant in the mildly impaired range. (*Id.*).

As to Recognition, Defendant scored in the impaired range for word-list recognition on the CVLT-II and WMS-IV tests. (*Id.* at 5). Dr. Ouaou noted that Defendant was not able to adequately discriminate between learned and non-learned information. (*Id.*).

As to Spatial Analysis/Synthesis, Defendant's score on the WAIS-IV Block Design test placed him in the average range compared to age-matched peers. (*Id.* at 6). Matrix reasoning from the WAIS-IV test, however, showed Defendant's range to be low average. (*Id.*).

As to Reasoning/Problem Solving/Executive Function, Dr. Ouaou indicated that "[e]xecutive functions are those neuropsychological processes that allow an individual to plan, initiate, program, sequence, and maintain goal-directed behavior, especially under novel circumstances." (*Id.*). The report continued stating that "[t]hese complex cognitive functions also allow an individual insight into the intent of their behavior." (*Id.*). Moreover, executive functions allow individuals to alter her/his behavior to meet the demands of a task or inhibit nonproductive behavior. (*Id.*). Dr. Ouaou noted that executive functions are affected by "global traumatic brain injury as well as focal injuries to the frontal lobes of the brain." (*Id.*). Within this subsection of results, Defendant scored in the low average range (16th percentile) for verbal reasoning and abstraction. (*Id.*). Additionally, Dr. Ouaou reported that Defendant's performance on several subtests of the Delis Kaplan Executive Function System test showed Defendant to be significantly impaired. (*Id.*). Defendant demonstrated perseverative responses and other impairments consistent with frontal lobe/executive dysfunction. (*Id.*). Moreover, Defendant showed impaired performance on several variables of the Wisconsin Card Sorting Test. (*Id.* at 6-7).

Dr. Ouaou summarized the results of Defendant's testing and opined that the tests administered were valid and represented a comprehensive summary of Defendant's intellectual and cognitive functioning. (*Id.* at 7). Dr. Ouaou concluded that Defendant "put forth maximum effort on measures associated with malingering or feigning cognitive impairment." (*Id.*). As to intellectual functioning, Dr. Ouaou opined that Defendant has "significant diminished general

intellect that has been acquired." (*Id.*).  As to cognitive functioning, Dr. Ouaou reported that Defendant exhibited "cognitive deficits that are found in patients with acquired neurological injury or disease." (*Id.*).

Dr. Ouaou's overall assessment of Defendant concluded that Defendant demonstrated mild signs of acquired brain damage related to traumatic brain injuries.  (*Id.*).  Specifically, Defendant exhibited cognitive deficits and symptoms found in patients with focal brain damage of the frontal lobe.  (*Id.*).  However, Dr. Ouaou opined that Defendant's overall intellect has not been affected and that Defendant's "history of ADHD may be contributory." (*Id.*).

Dr. Ouaou diagnosed Defendant with (1) Major Neurocognitive Disorder secondary to Traumatic Brain Injuries, (2) severe ADHD, and (3) History of Polysubstance Abuse.  (*Id.*).

Dr. Ouaou concluded that within a reasonable degree of psychological certainty Defendant "lacks the capacity to proceed pursuant to [the *Dusky* standard]." (*Id.* at 8).  Dr. Ouaou also concluded that Defendant "has significant cognitive and psychiatric defects beginning most likely at birth.  Unfortunately, he never received adequate rehabilitation or treatment and demonstrated severe impairments on current neuropsychological examination." (*Id.*).  Specifically, Dr. Ouaou reported that while Defendant "understands the adversarial nature of the legal process and the roles of a jury or attorney," Defendant Deruiter "does not have a sufficient present ability to consult with his lawyer or assist in preparing his defense." (*Id.*).  Dr. Ouaou opined that Defendant's abilities to disclose facts to his attorney pertinent to the proceedings and testify relevantly are impaired.  (*Id.*).  Dr. Ouaou also opined that "[t]he etiologies of the mental defects . . . are treatable with psychiatric medication.  However, without medication, it is opined that [Defendant] will continue to lack the competency to proceed." (*Id.*).

b. *Forensic Evaluation by Dr. Rodolfo Buigas, Ph.D.*

Dr. Rodolfo Buigas, Ph.D. evaluated Defendant at FDC Miami from December 2014 to February 2015. (Doc. 59 at 2). Dr. Buigas' report is dated March 26, 2015. (*Id.*). Various psychological tests and clinical interviews were conducted at FDC Miami by Dr. Buigas, Dr. Feldman, and Alexandra Crouch, M.S., a graduate psychology student under the supervision of Dr. Buigas. (*Id.*). Subsequent information obtained by Defendant indicated that James Pittman, a graduate student, also participated in evaluating Defendant. (Doc. 54 at 3 ¶ 13). In addition to testing and interviews, Dr. Buigas reviewed legal documents including the Order for psychological evaluation, Motion for Hearing to Determine Competency, medical and psychological records from BOP facilities, Dr. Ouaou's report, and information from a National Crime Information Center report. (Doc. 59 at 2).

Dr. Buigas described Defendant's developmental history. Dr. Buigas reported a "tumultuous upbringing." (*Id.* at 3). Defendant reported that his mother threw him out of a first-floor window when he was one-month old. (*Id.*). Defendant reported being abandoned by his mother. (*Id.*). Defendant's father was described as physically abusive. (*Id.*). Defendant resided in numerous foster homes and, at one point, with his grandmother. (*Id.*). Defendant reported frequent school changes and described problems with attention, hyperactivity, and behavior. (*Id.*). Defendant reported taking special education classes following a motor vehicle accident. (*Id.*). Defendant reported a sparse employment history. (*Id.*).

As to Defendant's psychiatric history, Defendant reportedly treated with a psychologist around the age of seven lasting less than a year followed by treatment with a psychologist at an unspecified program on weekends, following the death of his father. (*Id.* at 4). Defendant reported approximately ten suicide attempts and several psychiatric hospitalizations. (*Id.*).

Additionally, Defendant indicated that he suffered ADHD as a child but did not take medication. (*Id.*).  Defendant did not report taking psychiatric medications at the time of evaluation, but noted that "friends and doctors said I was Bipolar."  (*Id.*).  Defendant reported an extensive substance abuse history, including continued use of cocaine and alcohol until his current arrest. (*Id.*).

Dr. Buigas noted Defendant's past reported criminal history and the description of the current offense.  (*Id.* at 4-5).  Defendant reportedly acknowledged the charge, but denied any involvement.  (*Id.* at 5).

Dr. Buigas documented Defendant's behavioral observations during the course of the evaluation.  (*Id.*).  Defendant was cooperative with evaluation procedures and did not appear to have any difficulty functioning in the structured environment of the institution.  (*Id.*). Correctional staff indicated that Defendant followed the rules and regulations of the institution without incident and that Defendant completed adaptive living skills such as personal hygiene, eating meals, and cleaning his room independently.  (*Id.*).

As to Defendant's current mental status, Dr. Buigas indicated that Defendant displayed adequate attention to dentition, hygiene, grooming, and dress.  (*Id.*).  Defendant's eye contact was reported to be variable ranging from appropriate to minimal, and his facial expressions were congruent with verbalizations.  (*Id.*).  Defendant's attitude was sociable and cooperative, but Dr. Buigas reported that Defendant invalidated most psychological testing due to uncandid responding.  (*Id.*).

Dr. Buigas reported that Defendant was oriented to his current and legal circumstances throughout the evaluation period.  (*Id.*).  Defendant's thought processes were "logical and goal-directed, but circumstantial and overly detailed."  (*Id.*).  Dr. Buigas reported that attention and

concentration were poor and that Defendant required frequent redirection to remain on topic. (*Id.*).  Dr. Buigas recounted that Defendant responded well to such interventions.  (*Id.*).  In Dr. Buigas' opinion, Defendant displayed adequate processing speed, but thought content was remarkable for hyperactivity, distractibility, anxiety, and somatic complaints.  (*Id.*).  Defendant did not exhibit any delusional, obsessional, homicidal, or suicidal ideations.  (*Id.*).  Defendant did not appear to react to internal stimuli to the forensic examiner, but Defendant reported auditory and visual hallucinations to a graduate psychology student.  (*Id.*).  In Dr. Buigas' opinion, Defendant's memory appeared grossly intact for autobiographical recall and for recent information.  (*Id.*). Defendant demonstrated mild pragmatic issues such as interrupting the examiners during contacts, but receptive language abilities were intact.  (*Id.*).  Defendant's expressive language was reported as verbose, but generally organized and appropriate.  (*Id.*). Defendant's mood ranged from normal to mildly anxious to depressed and tearful when discussing his family.  (*Id.* at 6).  Defendant displayed a full range and intensity of emotional expression and his affect was congruent with his verbalizations.  (*Id.*).  Dr. Buigas reported that Defendant's judgment as to cause and effect were intact as well as insight into his mental state and legal status.  (*Id.*).  Finally, Defendant's mental status was recounted to be consistent throughout the evaluation period.  (*Id.*).

The report then discussed the results of Defendant's psychological testing administered by Dr. Buigas.  The results for psychological testing are divided into two sections:  (1) Cognitive Functioning; and (2) Psychological/Personality Functioning.

Defendant's Cognitive Functioning results are discussed in the context of five subparts: (i) Executive Functioning; (ii) Attention and Memory; (iii) Language; (iv) Processing Speed; and (v) Motivation.

First, as to Executive Functioning, the report indicated that Defendant was given the Booklet Category Test-Second Edition ("BCT") to "detect the presence of neuropsychological impairment such as that found in brain injuries or disease." (*Id.*). Defendant scored in the below average range of functioning, which Dr. Buigas stated "is not indicative of cognitive impairment." (*Id.*).

Second, as to Attention and Memory, Dr. Buigas administered two tests, the Digit Vigilance Test ("DVT") and the Neuropsychological Assessment Battery ("NAB")-Attention Module. (*Id.*). On the DVT, which involves discriminating numbers under time constraints, Defendant scored in the above average range for errors, but in the mild to moderate impairment range for total time to complete the task. (*Id.*). On the NAB-Attention Module, which is a "comprehensive measure of auditory and visual attention, working memory, psychomotor and information processing speed, as well as, selective and sustained attention," Defendant's score on the overall measure of attentional functioning was in the moderately to severely impaired range. (*Id.*). Dr. Buigas noted, however, that Defendant exhibited considerable variability on subtests with scores ranging from moderately to severely impaired to above average. (*Id.* at 6-7). Dr. Buigas reported that low scores can result from different conditions, including cognitive disorders, residual adult ADHD, and anxiety disorders. (*Id.* at 7).

Third, as to language, Dr. Buigas did not recount any disturbances for production, articulation, prosody, and word finding abilities. (*Id.*). Additionally, no dysarthria was noted in Defendant's speech. (*Id.*). Defendant was described as verbose but with pragmatic difficulties noted at times. (*Id.*). Defendant displayed grossly normal receptive and expressive language abilities and at least low average or higher word knowledge. (*Id.*).

Fourth, as to cognitive processing speed, Defendant scored in the mild to moderate impairment range for time completions in the DVT.  (*Id.*).

The final subsection of the cognitive functioning results is motivation.  Dr. Buigas wrote that this section "refers to indices designed to detect deviations from candid and accurate responding due to symptom exaggeration or minimization, or carelessness on measures of cognitive abilities."  (*Id.*).  Dr. Buigas reported that Defendant achieved multiple "elevations on indices suggestive of the exaggeration of neurocognitive impairment" on the BCT test.  (*Id.*).  Moreover, Dr. Buigas wrote that "these indices are developed to discriminate accurately between genuine neurocognitive impairment and the fabrication of such impairment."  (*Id.*).  Dr. Buigas reported that Defendant's scores were suggestive of "false portrayal of neurocognitive impairment."  (*Id.*).  Specifically, Defendant achieved elevations on "two of the indices that are infrequently elevated by genuine cognitively impairment populations."  (*Id.*).

Moreover, Defendant completed the Validity Indicator Profile ("VIP"), a test designed to detect an individual's response style on measures of similar cognitive abilities in tests that are administered concurrently.  (*Id.*).  On this test, Defendant achieved a "Suppressed" response style on the verbal subtest, suggesting that Defendant deliberately chose incorrect answers.  (*Id.*).  Dr. Buigas stated, "The chances that the defendant achieved the observed level of performance from guessing alone is less than 1%."  (*Id.*).  Defendant achieved an "Inconsistent" response style on the nonverbal subtest, which is suggestive of a lack of sustained effort.  (*Id.*).  In Dr. Buigas' opinion, Defendant demonstrated "poor to inconsistent motivation to present his cognitive abilities accurately; therefore, the current results should be viewed with caution as valid indications of his current cognitive functioning."  (*Id.* at 8).

Dr. Buigas distinguished his motivation testing from Dr. Ouaou's testing.  Dr. Buigas stated that Dr. Ouaou administered two measures of cognitive effort (*i.e.*, TOMM and CVLT-II), but these measures only assessed effort of immediate and recent memory rather than effort for other specific or general cognitive domains.  (*Id.*).

The second section of results for the psychological testing performed by Dr. Buigas assessed Defendant's Psychological/Personality Functioning.  (*Id.*).  Defendant took the Minnesota Multiphasic Personality Inventory-2-Restructured Form ("MMPI-2-RF"), a test of personality and psychiatric characteristics.  (*Id.*).  This test allows for a comparison of scoring patterns of normal and psychiatric populations.  (*Id.*).  Here, Dr. Buigas reported that Defendant approached the test with a "consistent and exaggerated endorsement of psychiatric symptoms," rendering the test invalid for clinical interpretation.  (*Id.*).  Dr. Buigas also administered the Structured Interview of Reported Symptoms, Second Edition ("SIRS-II") test to detect the presence of malingering.  (*Id.*).  Defendant's results on this test also suggested the feigning of psychiatric symptoms.  (*Id.*).

Based on those tests, Dr. Buigas stated that Defendant's view of his environment is realistic overall, and Defendant appears to be extroverted with a variable self-concept.  (*Id.*).  Dr. Buigas further stated that Defendant is "prone to negative mood states such as anxiety, but does experience extended periods of euthymic mood."  (*Id.*).  Behaviorally, Dr. Buigas wrote that Defendant has difficulties with impulsivity, asocial activities, and substance abuse.  (*Id.*).

Dr. Buigas diagnosed Defendant with Malingering, ADHD, combined presentation, severe, unspecified Opioid-Related Disorder, unspecified cannabis-related disorder, unspecified Alcohol-Related Disorder, unspecified stimulant-related (cocaine) disorder, adjustment disorder with anxiety, and other specified personality disorder (Mixed Borderline, Dependent, and

Antisocial Personality Features).  (*Id.* at 8-9).  Dr. Buigas reported that Defendant's prognosis is mixed.  (*Id.* at 11).  Defendant's current mental status appears relatively stable, but Defendant exhibited significant disturbances of attention.  (*Id.*).

The report concluded with an opinion on competence.  (*Id.*).  Dr. Buigas' assessed Defendant in several areas of courtroom knowledge and abilities, including the ability to understand courtroom proceedings, ability to understand the charges, and the ability to assist defense counsel.  (*Id.*).  Dr. Buigas opined that Defendant "impressed as having a variable understanding of the legal process."  (*Id.*).  For example, Defendant was reported to have known that the criminal charges were "'Child Porn' and that there were numerous pictures in his computer, but minimized any responsibility for possession of the material."  (*Id.*).  Defendant also reportedly understood and questioned the parameters of the Dr. Buigas' evaluation.  (*Id.*).

Furthermore, Defendant was administered the Evaluation of Competency to Stand Trial-Revised ("ECST-R") test.  (*Id.*).  The ECST-R is an objective measure of legal knowledge and abilities related to trial competency.  (*Id.*).  The test measures several subcategories of competence including Consult With Counsel ("CWC"), a measure of a defendant's ability to work with a defense attorney; Factual Understanding of the Courtroom Proceeding ("FAC"), a measure of a defendant's understanding of courtroom and general legal knowledge; and Rational Understanding of the Courtroom Proceedings ("RAC"), a measure of defendant's ability to make decisions involving realistic appraisal of likely legal outcomes.  (*Id.*).  Additionally, the test also measures the Overall Rational Ability, a combination of scores on the RAC and CWC scales.  (*Id.*).

For the FAC, RAC, and Overall Rational Ability, Defendant scored in the normal to mild impairment range, representing the highest, non-impaired level.  (*Id.*).  Dr. Buigas noted that

"[t]he sole category that the defendant achieved a score in the Moderate Impairment score was in the domain of CWC." (*Id.*).  While Defendant "verbalized appropriate methods of resolving conflicts with his attorney, expressed a positive view of his attorney, and realistic expectations regarding his attorney," Defendant reportedly was "vague in some respects and tended to be somewhat disorganized in his statements." (*Id.*).  Dr. Buigas wrote that Defendant required "frequent redirection to maintain relevant topics." (*Id.*).  Dr. Buigas noted that the results showed signs of fabrication and/or exaggeration of impairments related to competency to stand trial.  (*Id.*).

Defendant was also administered the Inventory of Legal Knowledge (ILK) test, an indirect measure of competency to stand trial.  (*Id.* at 12).  Here, Defendant's score suggested that he was feigning "deficits in legal knowledge and the ability to participate in the legal process." (*Id.*).  Dr. Buigas suggested this finding raised significant concerns "regarding the validity of the overall forensic evaluation, and suggests that his understanding and ability related to trial competency may be better than what he is attempting to portray." (*Id.*).

Based on all of the results, Dr. Buigas opined that Defendant "may have attentional impairment," but that Defendant's current mental status is stable overall.  (*Id.*).  Dr. Buigas stated that Defendant has "an adequate level of understanding of the legal process and he did not demonstrate any symptoms of a mental illness that would interfere with an understanding of the legal process and his situation." (*Id.*).  In his opinion, Defendant demonstrated "an ability to comport his behavior appropriately and engage in meaningful interactions . . . ." (*Id.*).  Dr. Buigas did state, however, that Defendant's attorney "needs to take an active role in directing the conversation toward a meaningful manner." (*Id.*).  Nevertheless, Dr. Buigas recommended that Defendant be found competent to stand trial.  (*Id.*).

## II.    Testimony at the October 29, 2015 Hearing

A competency hearing was held on October 29, 2015.  Defendant called Dr. Ouaou as his only witness.  The Government called Dr. Buigas as its only witness.

### a.   Testimony by Dr. Ouaou

Dr. Ouaou began his testimony by recounting his credentials from his *curriculum vitae*. (Tr. at 12).[1]  Dr. Ouaou was tendered and accepted by the Court as an expert in neuropsychology and clinical psychology.  (*Id.* at 16).  Dr. Ouaou explained that neuropsychology is "the application of psychological behavioral science to the study and treatment of known neurologic diseases."  (*Id.* at 11).   Specifically, Dr. Ouaou stated that "[n]europsychology is a specialized discipline of clinical psychology."  (*Id.* at 17).  This discipline requires a "postdoctoral fellowship and specialized training in brain behavior relations, which includes neurology, neuroanatomy, and the . . . construction, administration, and interpretation of neuropsychological tests, which are psychological tests specialize[d] and known to . . . have relations to brain damage and neurologic diseases."  (*Id.*).  Clinical psychology, however, according to Dr. Ouaou is not as specialized and generally only involves the treatment or assessment of emotional and behavioral disorders.  (*Id.*).  Dr. Ouaou testified that his evaluation, discussed *supra*, was a "forensic neuropsychological evaluation."  (*Id.*).  A forensic neuropsychological evaluation differs from a forensic psychological evaluation because a forensic neuropsychological evaluation focuses on the possibility of neurologic impairment affecting cognition as it relates to one's ability.  (*Id.*).

Dr. Ouaou testified that he saw Defendant over the course of two evaluations.  (*Id.* at 19). Dr. Ouaou conducted an initial evaluation to see whether a second, comprehensive evaluation

---

[1] The transcript for the hearing is filed as Doc. 76, but is cited herein as "Tr."

was warranted.  (*Id.*).  Dr. Ouaou felt that a second session was warranted and conducted a

psychological evaluation of Defendant on November 3, 2014 with Defendant handcuffed in a

quiet, distraction-free room.  (*Id.* at 20-21).

Dr. Ouaou first discussed symptom validity and malingering to "dispel the hypothesis or

the notion that the examinee is . . . not giving full effort."  (*Id.* at 24).  Dr. Ouaou stated that he

gave four validity tests for cognitive measures, which showed that Defendant was not "feigning

or faking a cognitive measure" on the date of examination.  (*Id.* at 24-26).

After discussing symptom validity, Dr. Ouaou discussed the IQ results from the TOPF

and WAIS-IV tests.  Dr. Ouaou testified that "it appears that [Defendant] does have significant

diminished intellect that has been acquired."  (*Id.* at 28).  Moreover, Dr. Ouaou recounted the

results from each of the four sections discussed above:  (1) attention and concentration, (2)

learning and memory, (3) spatial analysis and synthesis, and (4) reasoning, problem solving, and

executive functioning.  (*Id.* at 31-34).  For attention and concentration, Dr. Ouaou testified that

his observations, in general, were that "[b]ased on the data, [Defendant] has some significant

attention problems, and certainly some difficulties with speed of processing information."  (*Id.* at

35).  As to learning and memory, Dr. Ouaou testified that Defendant was "generally significantly

impaired."  (*Id.* at 43).  For spatial analysis, Dr. Ouaou opined that Defendant's abilities

remained largely intact.  (*Id.* at 46).  Finally, for reasoning, problem solving, and executive

functioning, Dr. Ouaou testified that Defendant had some difficulties with mental flexibility,

problem solving, and inhibition, scoring in the low average range for some measures.  (*Id.*).

Dr. Ouaou attributed Defendant's cognitive deficits to organic brain damage, not to

disinterest, inattention, or laziness.  (*Id.* at 49).  Dr. Ouaou stated that while having medical

records would be helpful, he did not need them to conclude that Defendant has "frontal lobe

damage and some type of disease that's neurological." (*Id.* at 51).   In his practice, Dr. Ouaou

finds that his testing is just as compelling and informative as medical procedures such as MRIs

and CAT scans.   (*Id.*).   Dr. Ouaou stated that his testing generally produces reliable results.   (*Id.*).

Moreover, Dr. Ouaou testified that not everyone is qualified to give a neuropsychological

assessment because it requires extensive training.   (*Id.* at 35).   Additionally, Dr. Ouaou stated

that he finds value in administering and scoring tests because it "ensures to [him] the reliability

and validity of the examination."   (*Id.* at 37).

In Dr. Ouaou's opinion, Defendant lacks the competency to proceed because of

Defendant's cognitive defects.   (*Id.* at 52).

On cross-examination, Dr. Ouaou testified that he saw Defendant for roughly 4.5 hours.

(*Id.* at 54).   Moreover, Dr. Ouaou opined that Defendant does, in fact, understand the nature of

the proceedings against him.   (*Id.* at 55).   Dr. Ouaou stated, however, that Defendant does not

have "sufficient ability to consult with his lawyer."   (*Id.*).   Dr. Ouaou testified that he did not

administer any tests that were "specifically geared towards legal competency," but stated that he

did not think such tests were necessary for his opinion.   (*Id.* at 55-56).

Dr. Ouaou was specifically questioned about his diagnosis that Defendant suffers from

ADHD and admitted that while Defendant did "require some repetition at times" to complete

testing, he was able to refocus Defendant so that he successfully completed the battery of exams.

(*Id.* at 60).   Additionally, Dr. Ouaou testified that, hypothetically, someone with very severe

ADHD might not be able to assist counsel.   (*Id.* at 61).

Dr. Ouaou was also questioned about his finding of a traumatic brain injury.   (*Id.* at 64-

65).   Other than self-reported information from Defendant and a scar, Dr. Ouaou had no other

evidence of any traumatic impacts occurring to Defendant.   (*Id.* at 65).   Moreover, Dr. Ouaou

testified that he did not know for sure whether Defendant's cognitive and psychiatric defects were the result of trauma to the head. (*Id.* at 65-66).

Dr. Ouaou was also questioned about Defendant's IQ scores. Dr. Ouaou's report described a decrease from 98 to 82 from premorbid testing to Defendant's current intellectual ability. (*Id.* at 68). Dr. Ouaou stated that this decrease represented a standard deviation of one. (*Id.*). Dr. Ouaou read into evidence portions of *Neuropsychological Assessment* by Muriel Lezak. (*Id.* at 72). Dr. Ouaou read that "[a] test score that appears to represent a one-SD change from premorbid functioning may not be a statistically significant change, but may indicate an impairment to some examiners, and only suggest impaired performance to others. A two-SD score impression is clear evidence of impairment." (*Id.*). Dr. Ouaou continued reading, "[s]ince approximately 15 percent of intact individuals obtain greater than one SD below test means, there is concern that too many individuals who are intact with respect to particular functions will be judged impaired when using negative one SD as an impairment criteria." (*Id.*). Dr. Ouaou then stated that not everyone agrees that a standard deviation of one for IQ scores is statistically significant. (*Id.*). Moreover, Dr. Ouaou indicated that there is a general decrease in cognitive functioning over time. (*Id.* at 75).

Dr. Ouaou testified that someone who has severe ADHD, but no traumatic brain injury, could still exhibit severe impairment to processing speed and immediate memory span. (*Id.* at 78). Moreover, Dr. Ouaou stated that it is possible for people meeting this description to understand the nature of the proceedings against them and assist counsel, if they have accommodation. (*Id.*).

On redirect and recross, Dr. Ouaou reiterated that his assessments led him to believe that Defendant has organic brain damage, but that if Defendant did not, in fact, have a traumatic brain injury, then he would not diagnose Defendant with that condition. (*Id.* at 81-85).

   b.   *Testimony by Dr. Buigas*

Dr. Buigas also testified at the hearing. After discussing his credentials and being questioned by Defense Counsel, Dr. Buigas was tendered as an expert in forensic psychology and neuropsychology. (*Id.* at 99). Defense counsel objected to Dr. Buigas being tendered and accepted as an expert in neuropsychology, but based on Dr. Buigas' testimony at the hearing concerning his prior education, training, and expertise, the Court accepted Dr. Buigas as an expert in both forensic psychology and neuropsychology. (*Id.*). Dr. Buigas explained the difference between forensic psychology and neuropsychology stating that for

> neuropsychological testing, you're looking at an assessment of the cognitive levels based on the assumption that there's been a decrease, or even just to get a baseline level of functioning due to some type of neurological condition, predominantly neurological condition. Forensic psychology will involve the assessment of a legal-psycho-legal question, such as competency, insanity, things of that nature.

(*Id.* at 99-100). Dr. Buigas opined that the reliability of neuropsychological testing and forensic psychological testing are equally valid. (*See id.* at 100).

Dr. Buigas indicated that he viewed his role in competency proceedings to be neutral because all evaluations are "are done for the Court." (*Id.* at 101). Dr. Buigas testified that "[t]he Court is our client." (*Id.* at 102).

Dr. Buigas testified that Defendant arrived at the BOP facility on December 19, 2014 and left March 24, 2015. (*Id.* at 102-03). Dr. Buigas and his staff administered tests for roughly "10 hours and 15 minutes" during that time frame with Dr. Buigas personally conducting examinations for five hours. (*Id.* at 109). Dr. Buigas stated that he was the primary evaluator,

but Dr. Feldman, another forensic psychologist, and two graduate students participated in the assessments.  (*Id.* at 102-03).  Dr. Buigas stated that while graduate students can test and interview examinees, he prepares all of his reports from "scratch" and all of the analysis is his own.  (*Id.* at 104-05).

Dr. Buigas then testified about Defendant's reported brain injury.  (*Id.* at 111). Defendant self-reported to Dr. Buigas that he had suffered a head injury following a motor vehicle accident at age seven.  (*Id.* at 112).  However, the Government submitted Exhibit 8, a history and physical administered when Defendant arrived at the BOP facility.  (*Id.* at 113).  The exhibit shows that a provider, Dr. McKittrick, conducted an examination that did not show a self-reported history of a head injury, even though Dr. McKittrick asked Defendant if a head injury had ever occurred.  (*Id.*).

In his evaluation, Dr. Buigas testified that Defendant was cooperative but was highly distracted and highly inattentive. (*Id.* at 115).  Dr. Buigas stated that Defendant "would go off on tangents and have to be redirected."  (*Id.*).  Dr. Buigas testified that he was able to successfully refocus Defendant when necessary and complete all tests.  (*Id.*).  Some tests, however, did take much longer than others because of the redirection.  (*Id.*).

Dr. Buigas then testified about Defendant's results on psychological testing, many suggesting that Defendant was malingering.  (*Id.* at 115-16).  First, Dr. Buigas discussed the MMPI-2-RF.  Within this test, Dr. Buigas stated that on two different scales, Defendant scored more than seven standard deviations above the average.  (*Id.* at 116-17).  Dr. Buigas concluded that Defendant, "across the board, was exaggerating symptoms."  (*Id.*).

Dr. Buigas next addressed Defendant's results on the SIRS-II.  The SIRS-II tests thirteen different strategies of malingering.  (*Id.* at 118).  Here, Defendant's results showed him to be in

the "feigning classification," and Dr. Buigas concluded that Defendant was exaggerating symptoms. (*Id.*).

Moreover, Dr. Buigas stated that the neuropsychological screening administered when Defendant arrived at FDC Miami has indicators of malingering built into the evaluation to determine if Defendant was malingering impairment due to head injury. (*Id.* at 120). On the BCT, Defendant met the criteria for malingering on two of the five scales. (*Id.*). Additionally, even though Defendant's results indicated that he was malingering, Dr. Buigas testified that Defendant did not qualify as impaired because he only scored in the low average range. (*Id.*).

Dr. Buigas next testified about results on the DVT, NAB-Attention Module, and VIP. (*Id.* at 123-28). For the DVT, Defendant scored above average on errors, but showed mild to moderate impairment on processing time. (*Id.* at 123). For the NAB Attention Module, Defendant achieved a score in the moderate impairment range. (*Id.*). Finally, for the VIP, Defendant's results suggested that he was malingering. (*Id.* at 124-28).

Dr. Buigas then discussed the ECST-R and ILK tests. (*Id.* at 129-32). Dr. Buigas first reiterated his findings for the ECST-R exam, stating that Defendant exhibited mild to normal impairment on the factual and rational components. (*Id.* at 129). In the Consult with Counsel section, Dr. Buigas testified that Defendant has a moderate impairment. (*Id.* at 130).

For the ILK exam, Dr. Buigas testified that the results showed Defendant was not giving his full effort. (*Id.* at 131). Defendant's results were consistent with the 93rd percentile of the malingering population. (*Id.* at 132).

Dr. Buigas diagnosed Defendant with ADHD, but not a traumatic brain injury. (*Id.*). Additionally, Dr. Buigas discussed the issue of ADHD affecting attention, but not memory. (*Id.* at 137). Specifically, Dr. Buigas testified that the working memory section of the WAIS test

administered by Dr. Ouaou addresses attention, not memory.  (*Id.* at 136).  Dr. Buigas stated that

with "inattention, if you are not attending to something, you are not encoding information.  So if

somebody is telling me something, and I don't pay attention to it, there is no way I'm going to

remember it.  So it's going to affect your memory."  (*Id.* at 137).

Dr. Buigas' ultimate conclusion is that Defendant is competent to stand trial.  (*Id.* at 133).

Dr. Buigas opined that Defendant has a factual and rational understanding of the legal process,

and an ability to assist in his own defense.  (*Id.* at 134).

Dr. Buigas also testified concerning his thoughts on Dr. Ouaou's report.  For example,

Dr. Buigas noted that there is "a lot of error" associated with premorbid estimates of functioning.

(*Id.* at 135).  Additionally, Dr. Buigas noted that everyone's cognitive functioning decreases over

time.  (*Id.* at 136).

On cross-examination, Dr. Buigas testified that by February 4, 2015, Defendant had been

incarcerated at FDC Miami for roughly seven weeks and had six assessments administered by

three different people.  (*Id.* at 155).  On February 9, Alexandra Crouch, a graduate student,

administered the DVT and NAB.  (*Id.*).  On the NAB-Attention Module, Dr. Buigas stated that

Defendant rated in the moderately to severely impaired category, scoring in the 0.47 percentile.

(*Id.* at 156).  While Dr. Buigas expressed doubts as to the results, Dr. Buigas stated that this test

does not have built-in indicators to detect malingering.  (*Id.* at 157).  In fact, Dr. Buigas stated

that no malingering tests were administered on that date.  (*Id.*).  However, Dr. Buigas stated that

the NAB results did not have to be accepted because Defendant took two neuropsychological

tests on that day and one showed that Defendant was above average.  (*Id.* at 159-60).  Dr. Buigas

testified that the inconsistent results from those tests can be an indicator of variable effort.  (*Id.* at

160).  Dr. Buigas explained that the "beauty of these evaluations in the Bureau of Prisons is that

we have them over an extended period of time to look at their performance not based on one day, but over an extended period of time, which is more valid." (*Id.* at 162).

Additionally, Dr. Buigas was questioned about the SIRS test, administered to detect malingering. Dr. Buigas conceded that the SIRS test only indicates whether a defendant is distorting symptoms that are psychiatric in nature and does not indicate if a defendant is faking poor attention. (*Id.* at 168). Moreover, Dr. Buigas stated that it is hard to deny that Defendant has problems with attention. (*Id.* at 194).

When questioned on cross-examination about the Consulting with Counsel section of the ECST-R exam, Dr. Buigas testified that Defendant was in the 92nd percentile. (*Id.* at 195). Dr. Buigas conceded that only eight percent of people Defendant's age show a worse result. (*Id.*). Nonetheless, Dr. Buigas testified that his primary justification for elevating Defendant's impairment range in the Consult with Counsel section was due to Defendant's need for redirection and Defendant's inattention. (*Id.* at 196). However, even with these results, Dr. Buigas testified that Defendant was only moderately impaired. (*Id.*).

Dr. Buigas further testified that Defendant's attorney "needs to take an active role in directing the conversation toward a meaningful manner." (*Id.*). Dr. Buigas indicated that even with all of the distractions, Defendant would still be able to function if he receives more attention. (*Id.* at 198). For example, Dr. Buigas stated that counsel could direct or redirect Defendant to pay attention or could explain things "a little bit lengthier" during breaks. (*Id.* at 199). Dr. Buigas stated that these interventions are not extreme, and he has seen these interventions be successful before. (*Id.* at 202).

On redirect, Dr. Buigas indicated that his assessment, including his findings of malingering, was based on the total evaluation. (*Id.* at 205).

### III.   Arguments by Counsel

After the expert testimony, counsel gave closing arguments.

####     a.  *Defendant's Argument*

Defendant first indicated that the parties agree that Defendant "has some problems with his memory." (*Id.* at 210).  However, Defendant argues that Dr. Buigas did not get to the bottom of Defendant's memory problems while Defendant was being observed at the BOP facility. (*Id.* at 210-11).

Defendant contests how Dr. Buigas determined symptom validity.  For instance, while Dr. Buigas administered malingering assessments several times, Dr. Buigas did not administer malingering assessments concurrently on February 9, 2015 when Defendant was administered the DVT and NAB Attention Module tests. (*Id.* at 213).  The Defense argues that these results showed significant impairment, but are improperly discounted by Dr. Buigas for malingering even though no malingering tests were administered that day. (*See id.*).  The Defense further argues that these tests "address the core of what Dr. Ouaou was arguing" that there is a memory and attention deficit attributable to brain damage. (*Id.* at 213-17).  Without malingering data, Defendant argues that these results must be accepted and they show that Defendant has issues with attention and memory. (*See id.*).

Defense counsel conceded that Defendant "knows what a judge does, knows what a lawyer does, he does.  Donnie Deruiter understands what happens in court, what juries do." (*Id.* at 218).  Defense counsel stated, however, that "Donnie Deruiter has got cognitive deficits that are so extensive that I have a hard time communicating with him at the jail" and that Defendant "has a very bad memory about what you told him, what he said, what happened." (*Id.*).  Counsel stated that Defendant can begin a sentence, but, by the end, he has "forgotten the meaning of the

sentence.  He's lost."  (*Id.*).  Moreover, counsel argued that Defendant does not have "the ability

to linearly track."  (*Id.*).  Counsel indicated that he did not see how Defendant would be able to

properly testify at trial, and thus, Defendant is not competent to stand trial.  (*Id.*).

        *b.  Government*

In response, the Government argued that Defendant is competent to stand trial.  The

Government pointed out that "understanding the nature of the proceedings" is not at issue here

because the parties agree that Defendant understands the nature of the proceedings.  (*Id.* at 220).

The Government argued that the only issue before the Court is Defendant's ability to consult

with counsel.  (*Id.* at 222).

Additionally, the Government acknowledged that Defendant's counsel may have issues

interacting and consulting with Defendant, that Defendant may not be a good witness, and that

Defendant may suffer psychological impairment.  (*Id.*).  However, the Government argued that

having those types of issues is not the standard for competence under the law.  (*See id.*).  The

Government contends that "a finding of mental incompetence to stand trial occurs in only the

rarest of circumstances, where [there is] something going on akin to mental retardation, or

psychosis . . . ."  (*Id.* at 223).

In support, the Government cited several cases demonstrating that courts in similar

circumstances have found defendants competent to stand trial.  For example, the Government

cited *United States v. Robinson*, 404 F.3d 850, 857 (4th Cir. 2005) for the proposition that a "low

intellectual ability" does not undermine an ultimate conclusion that the defendant was

competent.  Additionally, the Government cited *Basham v. United States*, No. CA 4:11-70079-

JFA, 2013 WL 2446104, at *53 (D.S.C. June 5, 2013), in which the Government explained that

the defendant had been "diagnosed ADHD, cognitive disorder not otherwise specified,

malingering, various substance abuse issues, learning disorder, antisocial personality disorder, and chronic back pain," but the Court found the defendant to be competent.  (Tr. at 224).

Moreover, the Government cited *United States v. Carter*, No. 1:12-CR-29, 2013 WL 6668715, at *1 (E.D. Tenn. Dec. 18, 2013) for the proposition that "[a] finding of competency does not mean Defendant does not have cognitive deficits."  (Tr. at 225).  There, the evidence supported a finding that the defendant was withdrawn, had a low IQ, and was a simple thinker with a poor verbal memory and could be expected to have difficulty with complex hypothetical questions, but was still found to be competent.  (*Id.* (citing *Carter*, 2013 WL 6668715, at *1)).

Additionally, the Government cited *Carter* to demonstrate that appropriate accommodations can be made for a defendant with cognitive defects.  (*See id.*).  In that case, the Court suggested (1) simplifying the proceedings wherever possible by paraphrasing complex concepts into familiar terms and avoiding legal jargon; (2) slowing down the proceedings and repeating information as needed to allow ample time for defendant to ask and respond to questions; and (3) allowing breaks in order to provide opportunities for counsel to discuss information and developments with the defendant as needed.   (*Id.* at 226 (citing *Carter*, 2013 WL 6668715, at *1)).

The Government argued that the evidence from Dr. Buigas' report shows that Defendant was malingering.  (*See* Tr. at 227).  Additionally, the Government contends that there is a lack of factual support that a head injury ever occurred.  (*See id.*).  Finally, to the extent a head injury may have occurred, the Government argued that Defendant's resultant physical condition does not meet the *Dusky* standard, and any conditions Defendant may have can be adequately accommodated.  (*See id.*).

IV.     **Analysis**

The Court will now analyze Defendant's claim that he is not competent to stand trial.

*a. Standard*

The federal competency standard is set forth in 18 U.S.C. § 4241.  The statute provides:

> If after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d).  The standard to determine mental competency to stand trial "is whether the defendant had 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he had has 'a rational as well as factual understanding of the proceedings against him.'"  *United States v. Nickels*, 324 F.3d 1250, 1252 (11th Cir. 2003) (citing *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986) (quoting *Dusky v. United States*, 362 U.S. 402 (1960)).  Low intelligence and weird behavior do not equate with mental incompetency to stand trial.  *McCune v. Estelle*, 534 F.2d 611, 612 (5th Cir. 1976).[2]

The statute is silent as to which party bears the burden of proof.  *See* 18 U.S.C. § 4241(d); *but see United States v. Izquierdo*, 448 F.3d 1269, 1277-78 (11th Cir. 2006) (stating upon review of the defendant's motion to withdraw a guilty plea based on incompetency that "the relevant competency statue arguably contemplates that the burden will lie with the party making a motion to determine competency").  Currently, there is some question regarding where the burden of proving competency to stand trial lies in federal criminal trials.  *United States v. Merriweather*, No. 2:07-CR-243-RDP-JEO, 2014 WL 5770213, at *41-42 (N.D. Ala. Nov. 5,

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

2014) (allocating the burden of proof to the Government based on an express offer by the Government to assume the burden of proving competency).  The Eleventh Circuit has indicated that, despite earlier precedent tending to show the contrary, *see United States v. Makris*, 535 F.2d 899, 905-06 (5th Cir. 1976), "we have since decided that 'a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence . . . .'"  *United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011) (citing *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995)).  Additionally, the Supreme Court has indicated, albeit in dicta, that the burden of establishing incompetence rests with the defendant.  *Id.* (citing *Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996) ("Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence.")).

Former Fifth Circuit precedent, however, indicates that "[t]here can be no question that in federal criminal cases the government has the burden of proving [a] defendant competent to stand trial at the [competency] hearing."  *Id.* (quoting *United States v. Makris*, 535 F.2d 899, 906 (5th Cir. 1976) (upon review of a pre-trial motion to determine competency)).

Nonetheless, in the present case, the Court finds that the *Bradley* decision controls.  *See Bradley*, 644 F.3d at 1268.  *Bradley* specifically addresses and distinguishes the former Fifth Circuit's decision in *Makris* and, thus, appears to abrogate *Makris* by placing the burden of proving incompetency on the defendant.  *See id.*  As a result, the Court finds that the burden of proving incompetency rests with Defendant here, and Defendant must prove his incompetency by a preponderance of the evidence.  *See Bradley*, 644 F.3d at 1268; 18 U.S.C. § 4241(d).  In deciding the issues in this case, however, the preponderance of the evidence shows that Defendant is competent and that the case should proceed to trial.  Even though there may be a

question as to who bears the burden, the evidence of competency in this case is not in equipoise and, thus, the Court finds that allocating the burden to the Defendant does not alter the outcome of the competency determination. *See Merriweather*, 2014 WL 5770213, at *42.

> b.  *Weight of Expert Testimony*

The preponderance of the evidence standard requires the Court to determine "that the existence of [the] fact is more probable than its nonexistence." *In re Winship*, 397 U.S. 358, 371 (1970). In evaluating the evidence, the Court is free to assign appropriate weight to the expert opinions it receives. *Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005). When the Court receives expert opinions with differing conclusions, it does not err "simply by crediting one opinion over another where other record evidence exists to support the conclusion." *Id.* (citing *Johnston v. Singletary*, 162 F.3d 630, 639 (11th Cir. 1998)).

In evaluating Defendant's competence, the Court finds the opinions of both experts to be sincerely held within their areas of expertise. "Doctors must remember that he or she is presenting an informed opinion, not a fact, and they should not be invested in any particular outcome." *Carter*, 2013 WL 6668715, at *12. Here, the Court concludes that the professional credibility of each expert was not successfully challenged by either party at the hearing.

Similarly, the Court weighs equally the expertise of each doctor. Based on the testimony at the hearing regarding their respective qualifications and experience, Dr. Ouaou was tendered and accepted by the Court as an expert in neuropsychology and clinical psychology (Tr. at 16), Dr. Buigas was tendered and accepted as an expert in neuropsychology and forensic psychology

(*Id.* at 99).[3]  The Court does not give either expert more weight than the other based on expertise alone.

In this case, however, the Court gives Dr. Ouaou's opinion less weight than Dr. Buigas' opinion because Dr. Ouaou evaluated the Defendant over a shorter period of time.  Dr. Buigas and his staff evaluated the Defendant over the course of several weeks and administered tests for roughly "10 hours and 15 minutes."  (*Id.* at 109).  Dr. Buigas personally conducted examinations for five hours.  (*Id.*).  In contrast, Dr. Ouaou only evaluated Defendant on two occasions and only administered tests for roughly 4.5 hours.  (*Id.* at 19 and 54).  Courts have given more weight to evaluations conducted over a longer period of time.  *See, e.g.*, *Carter*, 2013 WL 6668715, at *13 (according less weight to the evaluation conducted in the shortest amount of time).  Therefore, the Court affords Dr. Buigas' opinion more weight.

   c.  *Defendant's Competence*

As stated above, the competency standard requires the Court to find that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to (1) understand the nature and consequences of the proceedings against him or (2) assist properly in his defense.  18 U.S.C. § 4241(d).

In this case, both experts agree that Defendant suffers from memory and attention problems.  In fact, both experts diagnosed Defendant with severe ADHD.  (Doc. 23-1 at 7 and Doc. 59 at 8).  Dr. Ouaou testified that Defendant was "generally significantly impaired" as to learning and memory.  (Tr. at 43).  Moreover, CVLT-II testing showed that Defendant's

---

[3] The parties did not ask the Court to distinguish these experts based on the fact that one was tendered as an expert in "clinical psychology" while the other was tendered in the field of "forensic psychology."  Thus, the Court draws no distinction on that basis between these experts for purposes of evaluating the weight to be afforded to their respective positions.

immediate memory span, which impacts attention, was severely impaired.  (Tr. at 32).  Dr. Ouaou stated that "[b]ased on the data, he has some significant attention problems, and certainly some difficulties with speed of processing information."  (*Id.* at 35).

Similarly, Dr. Buigas testified that it is hard to deny that Defendant has problems with attention.  (*Id.* at 194).  Testing conducted by Dr. Buigas showed Defendant to have severely impaired attention.  (*Id.* at 157).  Furthermore, Dr. Buigas stated that attention affects memory.  Dr. Buigas testified that "if you are not attending to something, you are not encoding information.  So if somebody is telling me something, and I don't pay attention to it, there is no way I'm going to remember it.  So it's going to affect your memory."  (*Id.* at 137).  While Dr. Buigas testified that he had doubts about the validity of the testing due to the potential for malingering, the results showed that Defendant has issues with attention and memory.  (*Id.*).

Notwithstanding Defendant's problems with attention and memory, both experts agree that Defendant is able to understand the nature and consequences of the proceedings against him.  (Doc 23-1 at 8 and Doc. 59 at 12).  Dr. Ouaou wrote in his report that Defendant "understands the adversarial nature of the legal process and the roles of a jury or attorney . . . ."  (Doc 23-1 at 8).  Similarly, Dr. Buigas indicated that Defendant "has an adequate level of understanding of the legal process and he did not demonstrate any symptoms of a mental illness that would interfere with an understanding of the legal process and his situation."  (Doc. 59 at 12).  In fact, counsel for both parties conceded that this prong is not at issue in this case.  (Tr. 218-20).  Thus, because the experts and the parties agree, the Court finds that Defendant is not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him.  *See* 18 U.S.C. § 4241(d).

The issue, then, is whether Defendant can "assist properly in his defense." *See id.* In that regard, Dr. Ouaou stated in his report that Defendant "does not have a sufficient present ability to consult with his lawyer or assist in preparing his defense. Additionally, his abilities to disclose to [his] attorney facts pertinent to the proceedings and testify relevantly are impaired." (Doc. 23-1 at 8). Based on the testing administered, Dr. Ouaou attributed Defendant's impairments to an organic brain injury. (*Id.* at 49). However, other than self-reported data from Defendant and the results of his testing, Dr. Ouaou had no other evidence that any traumatic injury ever occurred. (*Id.* at 65).

While Dr. Ouaou did not find Defendant to be malingering on the day of his examination, as indicated above, the Court accords more weight to Dr. Buigas' opinion because of the length of his evaluation of Defendant. Dr. Buigas attributed much of Defendant's test results to malingering. (*See, e.g.*, Tr. at 115-20). Furthermore, even though Dr. Buigas conceded that his malingering testing only indicates whether a defendant is distorting psychiatric symptoms and not whether an examinee is faking poor attention (Tr. at 168), Dr. Buigas opined that, with accommodations, Defendant would be competent for trial. (*Id.* at 198). Dr. Buigas stated that Defendant's attorney "needs to take an active role in directing the conversation toward a meaningful manner," but that Defendant would still be able to function if he receives more attention. (*Id.* at 198). Examples of accommodations given by Dr. Buigas include redirection of attention by Defendant's attorney and lengthier proceedings. (*Id.* at 199). Dr. Buigas stated that these interventions are not extreme, and he has seen these interventions be successful before. (*Id.* at 202). In fact, the Court notes that both doctors indicated that additional time was necessary to complete their testing because of Defendant's attention issues. (Doc. 59 at 5 and Tr.

at 60).  Despite the additional time needed, both doctors were able to successfully redirect

Defendant's attention in order to complete testing.  (*Id.*).

In evaluating the present case, the Court looks to decisions by other courts on the same or

similar issues.  In *United States v. Glover*, 596 F.2d 857, 864-65 (9th Cir. 1979), the defendant

had an intelligence level at the lowest 1% of society, had memory problems, and suffered from a

short attention span.  There, experts opined that the defendant would only be competent to stand

trial if questions, terms, and proceedings were explained to him in very simple terms, using

concrete examples.  *Id.* at 865.  Despite these issues, the Ninth Circuit upheld a finding of

competency stating that "[t]he fact that a defendant might not understand the proceedings unless

they are explained to him in simple language would put an additional burden upon counsel, but

certainly does not establish that the defendant is incompetent to stand trial."  *Id.* at 867.

Additionally, the Court in *United States v. Carter* noted that "[a] finding of competency

does not mean Defendant does not have cognitive deficits.  *Carter*, 2013 WL 6668715, at *13.

There, the defendant was withdrawn, had a low IQ, and was a simple thinker with a poor verbal

memory and could be expected to have difficulty with complex hypothetical questions.  *Id.*

Despite these issues, the defendant was found to be competent.  *Id.*  That Court further suggested

that proper accommodations could be made for the defendant, including: (1) simplifying the

proceedings wherever possible by paraphrasing complex concepts into familiar terms and

avoiding legal jargon; (2) slowing down the proceedings and repeating information as needed to

allow ample time for defendant to ask and respond to questions; and (3) allowing breaks in order

to provide opportunities for counsel to discuss information and developments with Defendant as

needed.  *Id.*

Moreover, a finding of competency does not preclude the Court from providing accommodations. *United States v. May*, 475 F. Supp. 2d 1102, 1107 (D. Kan. 2007); *United States v. Marsee*, No. 6:04-73-S-DCR, 2006 WL 1464788, at *6 (E.D. Ky. May 22, 2006); *United States v. Housh*, 89 F. Supp. 2d 1227, 1231 (D. Kan. 2000). In *United States v. May*, for example, the Court acknowledged that a stroke and alcohol abuse left defendant with memory and information processing deficits but that those deficits did not render him incompetent to stand trial. *May*, 475 F. Supp. 2d at 1107. Additionally, while that defendant's deficits did not render him incompetent, the Court was willing to provide reasonable accommodations to aid defendant at the trial. *Id.* Similarly, in *United States v. Marsee*, the Court acknowledged that a gunshot left the defendant with memory and information processing deficits, but the Court did found that those deficits did not render the defendant incompetent to stand trial. *Marsee*, 2006 WL 1464788, at *6. In that case, similar to *May*, the Court found that, despite the finding of competency, the Defendant should be provided with reasonable accommodations to aid him at trial. *Id.* Finally, in *United States v. Housh*, the Court indicated that two automobile accidents left the defendant with memory and information processing deficits, but the Court found defendant to be competent. *Housh*, 89 F. Supp. 2d at 1231. In that case, like the two previous cases discussed above, the Court was willing to provide reasonable accommodations to aid the defendant at trial. *Id.*

In the present case, the Court weighed the evidence from the reports, the testimony of the expert witnesses, and the arguments made by counsel. Upon consideration of the record, the Court finds that Defendant has certain cognitive impairments. These impairments include memory and attention deficits (Tr. at 32, 43, 137, and 194) and a low IQ (Tr. at 27). In *Glover* and *Carter*, the defendants had memory and attention issues, yet, despite those issues, the courts

in both cases determined that the defendants were competent to stand trial. *See Glover*, 596 F.2d at 864-65; *Carter*, 2013 WL 6668715, at *13. Similarly, in *May*, *Marsee*, and *Housh*, the defendants suffered from memory and information processing deficits, but the courts in those cases found the defendants to be competent notwithstanding the deficits. *May*, 475 F. Supp. 2d at 1107; *Marsee*, 2006 WL 1464788, at *6; and *Housh*, 89 F. Supp. 2d at 1231. The Eleventh Circuit has held that "[e]ven perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers. That level of comprehension is not a requirement of competency." *United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir. 1993). In this case, like the cases discussed *supra*, the Court finds that, despite Defendant's memory and attention deficits and low IQ, the preponderance of the evidence shows that Defendant's condition is not so severe as to render him incompetent to stand trial. *See Glover*, 596 F.2d at 864-65; *Carter*, 2013 WL 6668715, at *13; *May*, 475 F. Supp. 2d at 1107; *Marsee*, 2006 WL 1464788, at *6; *Housh*, 89 F. Supp. 2d at 1231.

Moreover, the Court also agrees with Dr. Buigas that accommodations can be crafted sufficiently to aid with Defendant's cognitive limitations. (*See* Tr. at 198-202). As stated above, a finding of competency does not preclude the Court from providing accommodations. *See May*, 475 F. Supp. 2d at 1107; *Marsee*, 2006 WL 1464788, at *6; and *Housh*, 89 F. Supp. 2d at 1231. In *Glover*, for example, the Court found that Defendant could be competent to stand trial if questions, terms, and proceedings were explained to him in very simple terms, using concrete examples. *United States v. Glover*, 596 F.2d 857, 864-65 (9th Cir. 1979). Similarly, the Court in *Carter* recommended simplifying and slowing down the proceedings and repeating information as needed, allowing ample time for defendant to ask and respond to questions, and allowing

breaks for counsel to discuss information and developments with Defendant.  2013 WL 6668715, at *13.

In this case, the specific accommodations necessary for Defendant can be addressed with the District Judge at the final pretrial status conference.  The Court recommends, however, the following specific accommodations for the District Judge's consideration.  To begin, the Court recommends requiring another Public Defender to sit with Defendant at counsel table during trial.  The Court believes that additional co-counsel present with Defendant at counsel table will aid in keeping Defendant focused.  Moreover, co-counsel would be able to answer Defendant's questions and let lead counsel know when Defendant may need a break in the proceedings.  Additionally, the Court recommends simplifying and slowing down the trial proceedings, repeating information as needed, allowing ample time for Defendant to ask and respond to questions, allowing frequent breaks for counsel to discuss information and developments with Defendant, frequent redirection of Defendant's attention by Defendant's counsel and co-counsel, and lengthening the proceedings where necessary.  *See Glover*, 596 F.2d at 864-65; *Carter*, 2013 WL 6668715, at *13.

To be clear, the Court finds Defendant to be competent to stand trial in this case even without accommodation.  Nonetheless, the Court finds that providing the accommodations recommended above at trial would aid Defendant in consulting with his lawyers and assisting properly with his defense at trial.

## CONCLUSION

For the reasons stated above, the Court finds Defendant to be competent and recommends that this action should proceed to trial.

**IT IS RESPECTFULLY RECOMMEDED:**

That this action should proceed to trial.

Respectfully recommended in Chambers in Fort Myers, Florida on December 21, 2015.


_____
MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE



Copies furnished to:

Counsel of Record
Unrepresented Parties


**NOTICE TO PARTIES**

    A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.