UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                             CASE NO: 2:14-cr-46-FtM-38MRM

DONNIE DERUITER

_____/

## REPORT AND RECOMMENDATION[1]

This cause is before the Court regarding the competency of Defendant Donnie Deruiter.

For the reasons explained below, the Undersigned finds that Defendant is competent and

recommends that this action should proceed to trial.

### I.     Procedural Background

Defendant's competency proceedings have been extensive.  On November 26, 2014,

Defendant filed a Motion for Hearing to Determine Competency and attached an evaluation by

Dr. Robert Ouaou, Ph.D. and Dr. Ouaou's *curriculum vita* to the Motion.  (Doc. 23; Doc. 23-1;

Doc. 23-2).  On December 10, 2014, United States Magistrate Judge Douglas N. Frazier held a

hearing on Defendant's Motion.  The next day, on December 11, 2014, the Court found that there

was reasonable cause to believe that "Defendant may presently be suffering from a mental

disease or defect rendering him mentally incompetent to the extent that he is unable to

understand the nature and consequences of the proceedings against him or to assist properly in

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or
websites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that
hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other
websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the
services or products they provide on their websites.  Likewise, the Court has no agreements with
any of these third parties or their websites.  The Court accepts no responsibility for the
availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or
directs the user to some other site does not affect the opinion of the Court.

his defense pursuant to 18 U.S.C. §§ 4241 and 4247." (Doc. 29 at 1). Based on that finding, the Court ordered a psychological evaluation of Defendant. (*Id.* at 1 ¶ 1).

Defendant underwent an evaluation conducted by Dr. Rodolfo Buigas, Ph.D. at the Federal Bureau of Prisons ("BOP") Federal Detention Center in Miami, Florida ("FDC Miami"). (Doc. 59). Defendant was evaluated from December 2014 through February 2015. (*See id.* at 2). Dr. Buigas prepared a report, dated April 2, 2015, which was filed under seal. (*Id.*).

The Court conducted a competency hearing on October 29, 2015. (Doc. 69). Dr. Ouaou and Dr. Buigas testified at the hearing. Defendant was present for the hearing. Following the hearing, the Undersigned entered a Report and Recommendation (Doc. 85) on December 21, 2015, finding Defendant competent and recommending that this action should proceed to trial. (Doc. 85 at 38). The Undersigned also recommended that certain accommodations would aid the Defendant in consulting with his lawyers and assisting properly with his defense at trial. (*Id.*).

After obtaining an extension of time to do so (*see* Docs. 86-87), Defendant filed objections to the Report and Recommendation on February 19, 2016. (Doc. 91). On March 3, 2016, the Honorable Sheri Polster Chappell entered an Order (Doc. 94) overruling Defendant's objections and accepting and adopting the Report and Recommendation. On March 10, 2016, Defendant filed a Motion for Reconsideration, citing additional medical records not previously considered by the Court or the experts. (Doc. 95). In the alternative, Defendant's counsel sought leave to withdraw from the case if the Court denied reconsideration. (*Id.*). On April 11, 2016, Judge Chappell granted Defendant's Motion for Reconsideration on the issue of competency. (Doc. 107). The Court's April 11, 2016 Order referred the matter of Defendant's competency to the Undersigned "to consider the effect of Deruiter's medical report on [the] Report and Recommendation that Deruiter is competent to stand trial." (*Id.* at 5).

2

The Undersigned then conducted a series of status hearings to discuss and establish a procedure by which the issues raised in Judge Chappell's April 11, 2016 Order (Doc. 107) would be addressed.  Of note, Judge Chappell's April 11, 2016 Order on reconsideration only concerned a twenty-five (25) page medical report filed by Defendant under seal.  (Doc. 107 at 4) (citing Doc. 97)).  Subsequently, however, Defendant tendered a *much* larger volume of additional medical records – approximately 1,500 pages worth – for the Court's consideration.  (*See* Doc. 132 at 5-6).  The Undersigned ordered all of the additional medical records Defendant identified to be provided to the experts.  (Doc. 111 at 1 ¶ 1).  The Court further ordered counsel to discuss with the respective experts how each expert proposed to proceed "in considering the new medical records, including but not limited to (i) whether the expert proposes to supplement his prior opinion based solely on a review of the new medical records or (ii) whether the expert proposes some additional period of observation or testing of the Defendant in light of the new medical records."  (*Id.*).  Pending receipt of the experts' responses, the Court took under advisement Defendant's *ore tenus* request for a *de novo* evidentiary hearing on the issue of competency.  (*Id.* at 2 ¶ 3).

On May 10, 2016, the Court conducted an additional status conference.  (Doc. 115).  At the status conference, counsel for the Government stated that (1) Dr. Rodolfo Buigas required additional time to review the new medical records and to generate an addendum to Dr. Buigas' previous written report and (2) Dr. Buigas required an additional order from the Court authorizing him to generate an addendum to his previous report.  (Doc. 121 at 1).  The Court ordered Dr. Buigas to review the new medical records in question and to provide a written addendum to his original report regarding Defendant's competency to proceed in this matter.  (*Id.*).  After the status conference, the Court also granted Defendant's Motion to Permit Access to

Defendant (Doc. 114), allowing Dr. Ouaou (*i.e.*, Defendant's own expert) to visit Defendant at the Charlotte County Jail for purposes of a "professional meeting" any time during the month of May 2016. (Doc. 119).

On June 7, 2016, the Court conducted an additional status conference. (Doc. 122). At that status conference, the United States and Defendant submitted supplemental reports from Dr. Buigas and Dr. Ouaou on the issue of competency. (*See* Docs. 124-25). Additionally, the Court granted Defendant's request that the Court conduct a *de novo* hearing on the issue of Defendant's competency. (Doc. 123 at 2). On June 9, 2016, the Government filed a Motion for Reconsideration of the Court's Order Granting a *De Novo* Evidentiary Hearing (Doc. 126). On June 17, 2016, the Court denied the Government's Motion for Reconsideration. (Doc. 132 at 8).

On June 22, 2016, the Government filed a motion seeking to re-evaluate Defendant. (Doc. 134 at 4). On July 1, 2016, the Court granted the Government's Motion over Defendant's objection. (Doc. 137 at 8). Defendant was re-evaluated from July 2016 to August 2016 at FDC Miami. (Doc. 157 at 2). Dr. Buigas generated a new report on November 7, 2016. (*Id.*). The report was filed under seal on November 21, 2016. (*See id.*).

The Court conducted a *de novo* competency hearing on March 7-8, 2017. Dr. Ouaou and Dr. Buigas testified at the hearing. Defendant was present for the hearing. The Court also heard oral argument from counsel.

## II.      The Experts' Written Reports

Two written reports of forensic evaluations were filed in this case regarding Defendant's competency before the first competency hearing.  Since then, three additional reports have been submitted to the Court.  The Undersigned discusses the five written reports in turn below.[2]

### A.      Forensic Neuropsychological Evaluation by Dr. Robert Ouaou, Ph.D., dated November 25, 2014

Dr. Ouaou completed a Forensic Neuropsychological Evaluation of Defendant and issued a report dated November 25, 2014.  (Doc. 23-1 at 1).  Dr. Ouaou examined Defendant on August 24, 2014 and November 11, 2014.  (Id.).  Defendant Deruiter underwent several hours of neuropsychological assessment as part of the evaluation.  (Id.).  Defendant was evaluated in a private room, free from visual or auditory distractions.  (Id.).

Dr. Ouaou reviewed records of Defendant and took a relevant history.  (Id. at 1-2).  Defendant stated to Dr. Ouaou that he had been arrested for possession of child pornography.  (Id. at 2).  Defendant indicated that he was living at his parents' house at the time of arrest and that law enforcement had taken several computers and DVDs from his home.  (Id.).  Dr. Ouaou noted that Defendant "was extremely restless and tangential during the examination and had difficulties staying on topic."  (Id.).  Additionally, Defendant reportedly had trouble providing exact dates and other details related to his arrest.  (Id.).  Defendant did, however, understand that he could serve prison time if convicted.  (Id.).  Moreover, Dr. Ouaou reported that Defendant has "frank impairments in attention and concentration."  (Id.).  Further, throughout the examination, Defendant was tangential and circumstantial and had significant difficulties staying on task.

---

[2] The five reports discussed herein were admitted into evidence at the March 7-8, 2017 competency hearing.  For ease of reference, the Undersigned cites to the reports' corresponding docket entries, not to the exhibit numbers from the competency hearing.

(*Id.*).  Defendant's mood was depressed and anxious.  (*Id.*).  Defendant demonstrated severe psychomotor hyperactivity.  (*Id.*).  Additionally, many of the procedures required multiple explanations secondary to Defendant's difficulties maintaining attention and apparent comprehension defects.  (*Id.*).

Defendant's past reported medical history did not include any known systemic medical diseases, but Dr. Ouaou reported a history of "multiple head injuries stemming from childhood that have resulted in a loss of consciousness."  (*Id.*).  The first head injury reportedly occurred when Defendant fell out of a two-story window as an infant.  (*Id.*).  Defendant presented with a frontal facial scar.  (*Id.*).

Additionally, according to records reviewed by Dr. Ouaou, Defendant's parents abused alcohol and drugs.  (*Id.*).  Defendant was abandoned when he was three weeks old and his father reportedly died of a drug overdose when Defendant was nine years old.  (*Id.*).  Defendant was raised by his paternal grandmother and spent time in and out of foster care.  (*Id.* at 3).  Defendant reported a history of physical abuse.  (*Id.*).  Defendant took special classes as a child and completed eight years of formal education.  (*Id.*).  Defendant reported difficulties functioning in the classroom because of his poor attention and hyperactivity.  (*Id.*).

The report described a "chronic history of attention problems, hyperactivity, and impulsivity."  (*Id.* at 2).  Defendant's records described him as "emotionally disturbed, extremely restless, and hyperactive."  (*Id.*).  Dr. Ouaou wrote that, "[d]espite these symptoms, he has had little psychiatric treatment in the past."  (*Id.*).  Dr. Ouaou reported a history of chronic substance abuse.  (*Id.*).  Prior to his arrest, Defendant was prescribed Adderall, an Attention Deficit Hyperactivity Disorder ("ADHD") medication to treat cognitive and motor defects.  (*Id.*).

The report indicates that Dr. Ouaou administered a battery of neuropsychological tests on Defendant.  (*Id.* at 3).  This battery of tests examined Defendant in four areas:  (1) Symptom Validity and Malingering; (2) Intellectual Functioning; (3) Cognitive Functions; and (4) Learning and Memory.  (*Id.* at 3-5).

As to symptom validity and malingering, Dr. Ouaou noted that there is a possibility that an accused person may attempt to exaggerate his or her impairments.  (*Id.* at 3).  To determine validity of the procedure, Dr. Ouaou administered tests designed to reveal "less than genuine performance on the part of the test subject."  (*Id.*).  Dr. Ouaou wrote that "[o]n multiple tests of effort and motivation . . . the [Defendant] performed within normal limits.  Thus, the current evaluation is considered to be a valid profile of the [Defendant's] neuropsychological functioning."  (*Id.*).

As to intellectual functioning, Dr. Ouaou administered tests to determine Defendant's intelligence quotient ("IQ").  (*Id.*).  Dr. Ouaou first described the results of the Test of Premorbid Functioning ("TOPF").  (*Id.*).  The TOPF is a test designed to estimate an individual's intellectual ability prior to a neurological disease or injury.  (*Id.*).  Defendant scored in the average range, receiving a standard score of 98.  (*Id.*).

Dr. Ouaou's report next discussed Defendant's results on the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), an IQ test.  (*Id.* at 3-4).  Dr. Ouaou explained that the "Full Scale IQ is the aggregate of the index scores and is usually considered to be the most representative measure of global intellectual functioning."  (*Id.* at 4).  Defendant scored an 82 on the WAIS-IV Full Scale IQ test (*id.* at 3), indicating that Defendant's general cognitive ability is in the low average range and that Defendant's overall thinking and reasoning abilities exceed only approximately 12% of adults his age.  (*Id.* at 4).  The WAIS-IV test also measures verbal

comprehension and perceptual reasoning. (*Id.*). For verbal comprehension, Defendant scored an 85, placing his verbal reasoning abilities in the low average range, above approximately 16% of his peers. (*Id.*). As to perceptual reasoning, Defendant scored a 94, placing him in the average range above approximately 34% of his peers. (*Id.*).

The third area of test results address cognitive functions, specifically attention and concentration. (*Id.*). This section measures four subparts: (i) Immediate Memory Span; (ii) Focused and Flexible Attention; (iii) Processing Speed; and (iv) Working Memory. (*Id.*).

As to immediate memory span, Defendant demonstrated impaired performance. (*Id.*). Dr. Ouaou reported that Defendant was able to repeat "up to 7 digits forward on the WAIS-IV Digit Span, which is in the average range." (*Id.*). However, Defendant's recall of initial words on the California Verbal Learning Test-II ("CVLT-II") placed Defendant in the severely impaired range relative to age-matched peers. (*Id.*). Defendant's recall of a second interference list was in the impaired range. (*Id.*).

Focused and flexible attention measures "[c]ompletion time for tasks requiring motor speed, sequencing, and visual search." (*Id.*). Here, Defendant's scores ranged from average to mildly impaired. (*Id.*). However, when tasks were made more complex by requiring alternating cognitive sets, Defendant performed in the low average range. (*Id.* at 4-5).

As to Processing Speed, Defendant's score of 68 placed him in the severely impaired range, above only 2% of people his age. (*Id.* at 5).

Working Memory measures an "individual's ability to hold information temporarily in memory for the purpose of using that information to perform a specific task." (*Id.*). Dr. Ouaou stated that "[w]orking memory (*i.e.*, a higher level attentional ability) is an important prerequisite of many cognitive abilities such that inadequate working memory skills will likely affect an

individual's ability to perform other mental operations efficiently." (*Id.*). Defendant scored a 95, placing him within the average range on the WAIS-IV. (*Id.*). Finally, the report states that Defendant was able to repeat a maximum of 3 digits backwards, placing him in the impaired range relative to age-matched peers. (*Id.*).

The final section of test results address learning and memory. (*Id.*). Within this section, five discrete subparts are discussed in Dr. Ouaou's report: (i) Acquisition of New Information; (ii) Recall; (iii) Recognition; (iv) Spatial Analysis/Synthesis; and (v) Reasoning/Problem Solving/Executive Function. (*Id.* at 5-7).

As to acquisition of new information, Defendant's score on CVLT-II testing placed him in the severely impaired range compared to age-matched peers. (*Id.* at 5). Additionally, figure learning testing from the Wechsler Memory Scale-IV ("WMS-IV") test indicated that Defendant scored in the low average range. (*Id.*).

As to recall, Defendant's scores placed him in the severely impaired range for word-list recall. (*Id.*). Defendant's performance was equally impaired for short-delayed cued recall and long-delayed recall. (*Id.*). Figure recall from the WMS-IV test placed Defendant in the mildly impaired range. (*Id.*).

As to recognition, Defendant scored in the impaired range for word-list recognition on the CVLT-II and WMS-IV tests. (*Id.* at 5). Dr. Ouaou noted that Defendant was not able to adequately discriminate between learned and non-learned information. (*Id.*).

As to spatial analysis/synthesis, Defendant's score on the WAIS-IV Block Design test placed him in the average range compared to age-matched peers. (*Id.* at 6). Matrix reasoning from the WAIS-IV test, however, showed Defendant's range to be low average. (*Id.*).

As to reasoning/problem solving/executive function, Dr. Ouaou stated that "[e]xecutive functions are those neuropsychological processes that allow an individual to plan, initiate, program, sequence, and maintain goal-directed behavior, especially under novel circumstances." (*Id.*). The report also stated that "[t]hese complex cognitive functions also allow an individual insight into the intent of their behavior." (*Id.*). Moreover, executive functions allow individuals to alter behavior to meet the demands of a task or inhibit nonproductive behavior. (*Id.*). Dr. Ouaou noted that executive functions are affected by "global traumatic brain injury as well as focal injuries to the frontal lobes of the brain." (*Id.*). Within this subsection of results, Defendant scored in the low average range (16th percentile) for verbal reasoning and abstraction. (*Id.*). Dr. Ouaou reported that Defendant's performance on several subtests of the Delis Kaplan Executive Function System test showed Defendant to be significantly impaired. (*Id.*). Defendant demonstrated perseverative responses and other impairments consistent with frontal lobe/executive dysfunction. (*Id.*). Defendant also showed impaired performance on several variables of the Wisconsin Card Sorting Test. (*Id.* at 6-7).

Dr. Ouaou summarized the results of Defendant's testing and opined that the tests administered were valid and represented a comprehensive summary of Defendant's intellectual and cognitive functioning. (*Id.* at 7). Dr. Ouaou concluded that Defendant "put forth maximum effort on measures associated with malingering or feigning cognitive impairment." (*Id.*). As to intellectual functioning, Dr. Ouaou opined that Defendant has "significant diminished general intellect that has been acquired." (*Id.*). As to cognitive functioning, Dr. Ouaou reported that Defendant exhibited "cognitive deficits that are found in patients with acquired neurological injury or disease." (*Id.*).

Dr. Ouaou's overall assessment of Defendant concluded that Defendant demonstrated mild signs of acquired brain damage related to traumatic brain injuries.  (*Id.*).  Specifically, Defendant exhibited cognitive deficits and symptoms found in patients with focal brain damage of the frontal lobe.  (*Id.*).  However, Dr. Ouaou opined that Defendant's overall intellect has not been affected and that Defendant's "history of ADHD may be contributory."  (*Id.*).

Dr. Ouaou diagnosed Defendant with (1) Major Neurocognitive Disorder secondary to Traumatic Brain Injuries, (2) severe ADHD, and (3) History of Polysubstance Abuse.  (*Id.*).

Dr. Ouaou concluded that within a reasonable degree of psychological certainty, Defendant "lacks the capacity to proceed pursuant to [the *Dusky* standard]."  (*Id.* at 8).[3]  Dr. Ouaou also concluded that Defendant "has significant cognitive and psychiatric defects beginning most likely at birth.  Unfortunately, he never received adequate rehabilitation or treatment and demonstrated severe impairments on current neuropsychological examination." (*Id.*).  Specifically, Dr. Ouaou reported that while Defendant "understands the adversarial nature of the legal process and the roles of a jury or attorney," Defendant "does not have a sufficient present ability to consult with his lawyer or assist in preparing his defense."  (*Id.*).  Dr. Ouaou opined that Defendant's abilities to disclose facts to his attorney pertinent to the proceedings and testify relevantly are impaired.  (*Id.*).  Dr. Ouaou also opined that "[t]he etiologies of the mental defects . . . are treatable with psychiatric medication.  However, without medication, it is opined that [Defendant] will continue to lack the competency to proceed."  (*Id.*).

---

[3] *Dusky v. United States*, 362 U.S. 402 (1960).

**B.      Forensic Evaluation by Dr. Rodolfo Buigas, Ph.D., dated March 26, 2015**

Dr. Rodolfo Buigas, Ph.D. evaluated Defendant at FDC Miami from December 2014 to February 2015.  (Doc. 59 at 2).  Dr. Buigas' report is dated March 26, 2015.  (*Id.*).  Various psychological tests and clinical interviews were conducted at FDC Miami by Dr. Buigas, Dr. Feldman, and Alexandra Crouch, M.S., a graduate psychology student under the supervision of Dr. Buigas.  (*Id.*).  Subsequent information obtained by Defendant indicated that James Pittman, a graduate student, also participated in evaluating Defendant.  (Doc. 54 at 3 ¶ 13).  In addition to testing and interviews, Dr. Buigas reviewed relevant legal documents, medical and psychological records from BOP facilities, Dr. Ouaou's report, and information from a National Crime Information Center report.  (Doc. 59 at 2).

Dr. Buigas described Defendant's developmental history.  (*Id.* at 3).  Dr. Buigas reported a "tumultuous upbringing."  (*Id.*).  Defendant reported that his mother threw him out of a first-floor window when he was one-month old.  (*Id.*).  Defendant reported being abandoned by his mother.  (*Id.*).  Defendant's father was described as physically abusive.  (*Id.*).  Defendant resided in numerous foster homes and, at one point, with his grandmother.  (*Id.*).  Defendant reported frequent school changes and described problems with attention, hyperactivity, and behavior. (*Id.*).  Defendant reported taking special education classes following a motor vehicle accident. (*Id.*).  Defendant reported a sparse employment history.  (*Id.*).

As to Defendant's psychiatric history, Defendant reportedly treated with a psychologist around the age of seven lasting less than a year followed by treatment with a psychologist at an unspecified program on weekends, following the death of his father.  (*Id.* at 4).  Defendant reported approximately ten suicide attempts and several psychiatric hospitalizations.  (*Id.*). Defendant indicated that he suffered ADHD as a child but did not take medication.  (*Id.*).

Defendant did not report taking psychiatric medications at the time of evaluation, but noted that "friends and doctors said I was Bipolar." (*Id.*). Defendant reported an extensive substance abuse history, including continued use of cocaine and alcohol until his current arrest. (*Id.*).

Dr. Buigas noted Defendant's past reported criminal history and the description of the current offense. (*Id.* at 4-5). Defendant reportedly acknowledged the charge, but denied any involvement. (*Id.* at 5).

Dr. Buigas documented Defendant's behavioral observations during the course of the evaluation. (*Id.*). Defendant was cooperative with evaluation procedures and did not appear to have any difficulty functioning in the structured environment of the institution. (*Id.*). Correctional staff indicated that Defendant followed the rules and regulations of the institution without incident and that Defendant completed adaptive living skills such as personal hygiene, eating meals, and cleaning his room independently. (*Id.*).

As to Defendant's current mental status, Dr. Buigas indicated that Defendant displayed adequate attention to dentition, hygiene, grooming, and dress. (*Id.*). Defendant's eye contact was reported to be variable ranging from appropriate to minimal, and his facial expressions were congruent with verbalizations. (*Id.*). Defendant's attitude was sociable and cooperative, but Defendant invalidated most psychological testing due to uncandid responding. (*Id.*).

Dr. Buigas reported that Defendant was oriented to his current and legal circumstances throughout the evaluation period. (*Id.*). Defendant's thought processes were "logical and goal-directed, but circumstantial and overly detailed." (*Id.*). Dr. Buigas reported that attention and concentration were poor and that Defendant required frequent redirection to remain on topic. (*Id.*). Dr. Buigas recounted that Defendant responded well to such interventions. (*Id.*). Defendant displayed adequate processing speed, but thought content was remarkable for

hyperactivity, distractibility, anxiety, and somatic complaints.  (*Id.*).  Defendant did not exhibit any delusional, obsessional, homicidal, or suicidal ideations.  (*Id.*).  Defendant did not appear to react to internal stimuli to the forensic examiner, but Defendant reported auditory and visual hallucinations to a graduate psychology student.  (*Id.*).  Defendant's memory appeared grossly intact for autobiographical recall and for recent information.  (*Id.*).  Defendant demonstrated mild pragmatic issues such as interrupting the examiners during contacts, but receptive language abilities were intact.  (*Id.*).  Defendant's expressive language was reported as verbose, but generally organized and appropriate.  (*Id.*).  Defendant's mood ranged from normal to mildly anxious to depressed and tearful when discussing his family.  (*Id.* at 6).  Defendant displayed a full range and intensity of emotional expression and his affect was congruent with his verbalizations.  (*Id.*).  Dr. Buigas reported that Defendant's judgment as to cause and effect were intact as well as insight into his mental state and legal status.  (*Id.*).  Finally, Defendant's mental status was recounted to be consistent throughout the evaluation period.  (*Id.*).

The report then discussed the results of Defendant's psychological testing administered by Dr. Buigas.  (*Id.*).  The results for psychological testing are divided into two sections:  (1) Cognitive Functioning; and (2) Psychological/Personality Functioning.  (*Id.* at 6-8).

Defendant's Cognitive Functioning results are discussed in five subparts:  (i) Executive Functioning; (ii) Attention and Memory; (iii) Language; (iv) Processing Speed; and (v) Motivation.  (*Id.*).

As to executive functioning, the report indicated that Defendant was given the Booklet Category Test-Second Edition ("BCT") to "detect the presence of neuropsychological impairment such as that found in brain injuries or disease."  (*Id.* at 6).  Defendant scored in the below average range of functioning, which "is not indicative of cognitive impairment."  (*Id.*).

As to attention and memory, Dr. Buigas administered two tests:  the Digit Vigilance Test ("DVT"); and the Neuropsychological Assessment Battery ("NAB")-Attention Module.  (*Id.*). On the DVT, which involves discriminating numbers under time constraints, Defendant scored in the above average range for errors, but in the mild to moderate impairment range for total time to complete the task.  (*Id.*).  On the NAB-Attention Module, which is a "comprehensive measure of auditory and visual attention, working memory, psychomotor and information processing speed, as well as, selective and sustained attention," Defendant's score on the overall measure of attentional functioning was in the moderately to severely impaired range.  (*Id.*).  Dr. Buigas noted, however, that Defendant exhibited considerable variability on subtests with scores ranging from moderately to severely impaired to above average.  (*Id.* at 6-7).  Dr. Buigas reported that low scores can result from different conditions, including cognitive disorders, residual adult ADHD, and anxiety disorders.  (*Id.* at 7).

As to language, Dr. Buigas did not recount any disturbances for production, articulation, prosody, and word finding abilities.  (*Id.*).  Additionally, no dysarthria was noted in Defendant's speech.  (*Id.*).  Defendant was described as verbose but with pragmatic difficulties noted at times. (*Id.*).  Defendant displayed grossly normal receptive and expressive language abilities and at least low average or higher word knowledge.  (*Id.*).

As to cognitive processing speed, Defendant scored in the mild to moderate impairment range for time completions in the DVT.  (*Id.*).

The final subsection of the cognitive functioning results is motivation.  (*Id.*).  Dr. Buigas wrote that this section "refers to indices designed to detect deviations from candid and accurate responding due to symptom exaggeration or minimization, or carelessness on measures of cognitive abilities."  (*Id.*).  Dr. Buigas reported that Defendant achieved multiple "elevations on

indices suggestive of the exaggeration of neurocognitive impairment" on the BCT.  (*Id.*).

Moreover, Dr. Buigas wrote that "these indices are developed to discriminate accurately between

genuine neurocognitive impairment and the fabrication of such impairment."  (*Id.*).  Dr. Buigas

reported that Defendant's scores were suggestive of "false portrayal of neurocognitive

impairment."  (*Id.*).  Specifically, Defendant achieved elevations on "two of the indices that are

infrequently elevated by genuine cognitively impairment populations."  (*Id.*).

Moreover, Defendant completed the Validity Indicator Profile ("VIP"), a test designed to

detect an individual's response style on measures of similar cognitive abilities in tests that are

administered concurrently.  (*Id.*).  On this test, Defendant achieved a "Suppressed" response

style on the verbal subtest, suggesting that Defendant deliberately chose incorrect answers.  (*Id.*).

Dr. Buigas stated, "[t]he chances that the defendant achieved the observed level of performance

from guessing alone is less than 1%."  (*Id.*).  Defendant achieved an "Inconsistent" response

style on the nonverbal subtest, which is suggestive of a lack of sustained effort.  (*Id.*).  In Dr.

Buigas' opinion, Defendant demonstrated "poor to inconsistent motivation to present his

cognitive abilities accurately; therefore, the current results should be viewed with caution as

valid indications of his current cognitive functioning."  (*Id.* at 8).

Dr. Buigas distinguished his motivation testing from Dr. Ouaou's testing.  (*Id.*).  Dr.

Buigas stated that Dr. Ouaou administered two measures of cognitive effort (*i.e.*, TOMM and

CVLT-II), but these measures only assessed effort of immediate and recent memory rather than

effort for other specific or general cognitive domains.  (*Id.*).

The second section of results for the psychological testing performed by Dr. Buigas

assessed Defendant's Psychological/Personality Functioning.  (*Id.*).  Defendant took the

Minnesota Multiphasic Personality Inventory-2-Restructured Form ("MMPI-2-RF"), a test of

personality and psychiatric characteristics that allows for a comparison of scoring patterns of normal and psychiatric populations. (*Id.*). Here, Dr. Buigas reported that Defendant approached the test with a "consistent and exaggerated endorsement of psychiatric symptoms," rendering the test invalid for clinical interpretation. (*Id.*). Dr. Buigas also administered the Structured Interview of Reported Symptoms, Second Edition ("SIRS-2") to detect malingering. (*Id.*). Defendant's results on this test suggested the feigning of psychiatric symptoms. (*Id.*).

Based on those tests, Dr. Buigas stated that Defendant's view of his environment is realistic overall. (*Id.*). Additionally, Defendant appeared to be extroverted with a variable self-concept. (*Id.*). Dr. Buigas further stated that Defendant is "prone to negative mood states such as anxiety, but does experience extended periods of euthymic mood." (*Id.*). Behaviorally, Dr. Buigas wrote that Defendant has difficulties with impulsivity, asocial activities, and substance abuse. (*Id.*).

Dr. Buigas diagnosed Defendant with Malingering; ADHD, combined presentation, severe; unspecified Opioid-Related Disorder; unspecified cannabis-related disorder; unspecified Alcohol-Related Disorder; unspecified stimulant-related (cocaine) disorder; adjustment disorder with anxiety; and other specified personality disorder (Mixed Borderline, Dependent, and Antisocial Personality Features). (*Id.* at 8-9). Dr. Buigas recommended medications to treat his psychiatric conditions and his ADHD. (*Id.* at 11). For the ADHD, Dr. Buigas noted, however, the types of medications that would help were not available at the BOP. (*Id.*). Dr. Buigas reported that Defendant's prognosis is mixed. (*Id.*). Defendant's current mental status appears relatively stable, but Defendant exhibited significant disturbances of attention. (*Id.*).

The report concluded with an opinion on competence. (*Id.*). Dr. Buigas' assessed Defendant in several areas of courtroom knowledge and abilities, including the ability to

understand courtroom proceedings, ability to understand the charges, and the ability to assist defense counsel. (*Id.*). Dr. Buigas opined that Defendant "impressed as having a variable understanding of the legal process." (*Id.*). For example, Defendant was reported to have known that the criminal charges were "'Child Porn' and that there were numerous pictures in his computer, but minimized any responsibility for possession of the material." (*Id.*). Defendant also reportedly understood and questioned the parameters of Dr. Buigas' evaluation. (*Id.*).

Furthermore, Defendant was administered the Evaluation of Competency to Stand Trial-Revised ("ECST-R"). (*Id.*). The ECST-R is an objective measure of legal knowledge and abilities related to trial competency. (*Id.*). The test measures several subcategories of competence including Consult With Counsel ("CWC"), a measure of a defendant's ability to work with a defense attorney; Factual Understanding of the Courtroom Proceeding ("FAC"), a measure of a defendant's understanding of courtroom and general legal knowledge; and Rational Understanding of the Courtroom Proceedings ("RAC"), a measure of defendant's ability to make decisions involving realistic appraisal of likely legal outcomes. (*Id.*). The test also measures the Overall Rational Ability, a combination of scores on the RAC and CWC scales. (*Id.*).

For the FAC, RAC, and Overall Rational Ability, Defendant scored in the normal to mild impairment range, representing the highest, non-impaired level. (*Id.*). Dr. Buigas noted that "[t]he sole category that the defendant achieved a score in the Moderate Impairment score was in the domain of CWC." (*Id.*). While Defendant "verbalized appropriate methods of resolving conflicts with his attorney, expressed a positive view of his attorney, and realistic expectations regarding his attorney," Defendant reportedly was "vague in some respects and tended to be somewhat disorganized in his statements." (*Id.*). Dr. Buigas wrote that Defendant required

"frequent redirection to maintain relevant topics." (*Id.*). Dr. Buigas noted that the results showed signs of fabrication and/or exaggeration of impairments related to competency. (*Id.*).

Defendant was also administered the Inventory of Legal Knowledge ("ILK"), an indirect measure of competency to stand trial. (*Id.* at 12). Here, Defendant's score suggested that he was feigning "deficits in legal knowledge and the ability to participate in the legal process." (*Id.*). Dr. Buigas suggested this finding raised significant concerns "regarding the validity of the overall forensic evaluation, and suggests that his understanding and ability related to trial competency may be better than what he is attempting to portray." (*Id.*).

Based on all of the results, Dr. Buigas opined that Defendant "may have attentional impairment," but that Defendant's current mental status is stable overall. (*Id.*). Dr. Buigas stated that Defendant has "an adequate level of understanding of the legal process and he did not demonstrate any symptoms of a mental illness that would interfere with an understanding of the legal process and his situation." (*Id.*). In his opinion, Defendant demonstrated "an ability to comport his behavior appropriately and engage in meaningful interactions." (*Id.*). Dr. Buigas did state, however, that Defendant's attorney "needs to take an active role in directing the conversation toward a meaningful manner." (*Id.*). Nevertheless, Dr. Buigas recommended that Defendant be found competent to stand trial. (*Id.*).

### C.    Forensic Evaluation Addendum by Dr. Buigas, dated June 2, 2016

As indicated above, the Court ordered Dr. Buigas to review the additional medical records identified by Defendant that were not evaluated at the time of the first competency hearing. (Doc. 121 at 1-2). Dr. Buigas completed an addendum to his forensic evaluation. (Doc. 125). The addendum is dated June 2, 2016 and is filed under seal. (*Id.*). In the addendum,

Dr. Buigas addressed medical records from Maimonides Medical Center and North Collier Hospital relating to Defendant.  (*Id.* at 1).

For the records from Maimonides Medical Center, Dr. Buigas wrote that Defendant "was admitted from July 8 to 12, 1981 following a motor vehicle accident ["MVA"] in which he was struck by a car as a pedestrian." (*Id.* at 1).  Dr. Buigas noted from the records that Defendant was "admitted with complaints of head trauma without loss of consciousness, retrograde amnesia dizziness, or headache." (*Id.*).  As reflected in the records, a physical examination revealed the following neurological functioning:  "grossly intact cranial nerves II to XII, no muscle weakness, sensory or motor deficits and a resulting X-ray of the skull that was negative for a skull fracture." (*Id.* at 1-2).  Dr. Buigas also noted from the records that Defendant "was discharged with diagnoses of head trauma and fracture of the right leg," and was later seen for follow up on July 17 and 19, 1981.  (*Id.* at 2).

Dr. Buigas next detailed Defendant's medical records from North Collier Hospital emergency department.  (*Id.* at 2-4).  The records were dated from September 28, 2004 to February 13, 2014. (*Id.*).  In pertinent part, Dr. Buigas noted that Defendant was seen several times for purported head injuries.  (*Id.*).

For instance, on September 28, 2004, Defendant was seen for injuries to the head and face secondary to a MVA.  (*Id.* at 2).  Defendant was oriented with normal cranial nerve functioning.  (*Id.*).  Defendant received sutures, ice, and Tylenol for pain.  (*Id.*).  Defendant was diagnosed with "Laceration Chin, Closed Head Injury and Abrasions." (*Id.*).

On November 22, 2006, Defendant presented "with a complaint of a head injury secondary to an 'all-terrain vehicle accident on Saturday.'" (*Id.*).  Defendant was reportedly "unsure if he passed out." (*Id.*).  The physical examination "noted an alert male with a non-focal

neurological exam" and a computerized tomography ("CT") brain scan was negative.  (*Id.*).

Defendant was diagnosed with "Rib contusion and Post traumatic [sic] headache status post

closed head trauma" and discharged the same day.  (*Id.*).

On February 5, 2007, records indicate that Defendant was seen for injuries due to a

MVA.  (*Id.*).  Dr. Buigas noted from those records that Defendant was in a "rolled over" accident

and then transported by ambulance.  (*Id.*).  Defendant reportedly complained of severe back pain.

(*Id.*).  Defendant "was described as 'alert but obviously intoxicated.'"  (*Id.*).  A complete "12-

point review of systems" was performed but "was almost impossible because the patient was

obviously intoxicated."  (*Id.*).  X-rays of the C-spine, thoracic spine, and lumbar spine were

negative, and no neurological deficits were discovered.  (*Id.*).  Defendant was not hospitalized.

(*Id.*).  Defendant was "diagnosed with severe anemia, Alcohol intoxication, and contusion of the

back."  (*Id.*).

On February 19, 2007, two weeks after the MVA, Defendant was seen due to complaints

of neck pain.  (*Id.* at 3).  At that time, Defendant reportedly stated that he was "life flighted" to

Naples Community Hospital for treatment.  (*Id.*).  A physical examination at the time showed

unremarkable neurological findings.  (*Id.*).

Although Defendant visited the hospital on many other occasions, Dr. Buigas did not

note from those records any other instances of reported head injuries.  (*See id.* at 2-4).

In sum, Dr. Buigas stated that "the additional records submitted for review do not change

the author's prior opinion as to the defendant's competency to stand trial at the time of the

evaluation."  (*Id.* at 6).  Dr. Buigas wrote that "the additional records serve to corroborate the

previous diagnoses rendered by the author" and his prior opinion "that the defendant was

competent to stand trial."  (*Id.*).

### D.     Forensic Neuropsychological Re-Evaluation by Dr. Ouaou, dated June 6, 2016

On May 9, 2017, Defendant requested that the Court enter an order allowing his psychological expert, Dr. Robert Ouaou, to have access to him at the Charlotte County Jail for purposes of a "professional meeting" during the month of May 2017.  (Doc. 114 at 1-2).  The Court granted that request on May 11, 2017.  (Doc. 119).  Dr. Ouaou then re-evaluated Defendant on May 17, 2016.  (Doc. 124 at 1).  A report from Dr. Ouaou's re-evaluation was submitted to the Court and filed under seal.  (Doc. 124).  The re-evaluation represented an updated neuropsychological assessment and a review of supplemental medical records and court proceedings.  (*Id.* at 1-2).

Dr. Ouaou described the additional medical records submitted by Defendant and stated that they "confirmed evidence of traumatic brain injuries beginning in childhood."  (*Id.* at 2).  For instance, Dr. Ouaou stated that notes from Maimonides Hospital "indicated that Donnie was struck by an automobile at age 8 and suffered head trauma with concussion."  (*Id.*).  Additionally, Dr. Ouaou noted that records from Naples Community Hospital "revealed at least four separate admissions to the hospital for head injuries."  (*Id.*).

Dr. Ouaou described Defendant's relevant history.  (*Id.* at 3).  Defendant reportedly stated that he has "no idea what's going on in the case."  (*Id.*).  Defendant also stated that "the pod at the jail makes fun of him because of his inattention and forgetfulness."  (*Id.*).

Additionally, Dr. Ouaou described Defendant's current mental status.  (*Id.*).  Dr. Ouaou wrote that Defendant "has frank impairments in attention and concentration."  (*Id.*).  Defendant "was tangential but was able to focus on cognitive assessment tasks."  (*Id.*).  Defendant's mood was depressed and Defendant exhibited some uncontrolled weeping.  (*Id.*).  Defendant "denied current suicidal ideation but stated that he has had thoughts of jumping off a jail balcony twice

since the competency hearing." (*Id.*). Dr. Ouaou noted that Defendant was prescribed Zoloft. (*Id.*). Dr. Ouaou referred to his previous report for Defendant's past psychiatric history and developmental history. (*Id.*).

Dr. Ouaou then described the testing he administered. (*Id.*). Defendant was administered a battery of neuropsychological tests. (*Id.*). Dr. Ouaou wrote that "[t]his data can provide information leading to the diagnosis of a cognitive deficit or to the confirmation of a diagnosis, as well as to the localization of organic abnormalities in the central nervous system." (*Id.*).

As to symptom validity/malingering, "[o]n multiple tests of effort and motivation (TOMM, Embedded Measures, Word Choice, and CVLT forced choice) [Defendant] performed within normal limits." (*Id.* at 4). Dr. Ouaou opined that "the current evaluation is considered to be a valid profile of the examinee's neuropsychological functioning." (*Id.*).

The report next discussed Defendant's examination results for cognitive functions. (*Id.*).

As to immediate memory span, Defendant's recall of the initial list of words from the CVLT-II was in the severely impaired range relative to age-matched peers. (*Id.*). Defendant's recall of a second interference list was in the impaired range. (*Id.*).

As to focused and flexible attention, Defendant's "completion time for tasks requiring motor speed, sequencing, and visual search ranged from the moderately to severely impaired range compared to age matched peers." (*Id.*). When tasks were made more complex, Defendant performed within the moderately impaired range. (*Id.*).

As to processing speed, Dr. Ouaou wrote that the Processing Speed Index from the WAIS-IV provided a measure of the Defendant's ability to quickly and correctly scan, sequence, or discriminate simple visual information and also a measure of his short-term visual memory, attention, and visual-motor coordination. (*Id.*). Defendant's performance on tasks measuring

processing speed was reported to be better than only 3% of his age-mates.  (*Id.*).  Defendant's reading fluency was reportedly "impaired," being in the 7th percentile.  (*Id.*).  Defendant's math fluency was "impaired," being in the 8th percentile.  (*Id.*).

Dr. Ouaou's report next discussed Defendant's results for learning and memory.  (*Id.*).

As to acquisition of new information, Defendant's total list learning on the CVLT-II was in the impaired range compared to age-matched peers.  (*Id.*).  Defendant "was able to learn 13 words after 5 trials, which is in the average range."  (*Id.*).

As to recall, Defendant's "word-list recall following a brief delay and presentation of a second interference list was in the low average range."  (*Id.*).  Defendant was severely impaired at short delayed cued recall.  (*Id.*).  Dr. Ouaou wrote that Defendant "recalled 10 words following a 20-minute delay," which was in the low average range.  (*Id.*).  When Defendant was provided with cues at long-delayed recall, Defendant "recalled 6 words, which is in the severely impaired range."  (*Id.*).  Defendant's recall of visual material was in the "low average" range at short delay recall and at long delay recall.  (*Id.*).

As to recognition, Defendant's word-list recognition on the CVLT-II was impaired because Defendant "was unable to adequately discriminate between learned and non-learned information."  (*Id.* at 5).

Dr. Ouaou reported that Defendant's spatial analysis/synthesis was impaired.  (*Id.*).

As to Defendant's reasoning/problem solving/executive function, Dr. Ouaou noted that several subtests of the Delis Kaplan Executive Function System showed significant impairment. (*Id.*).  Defendant also "demonstrated perseverative responses and other impairments consistent with frontal lobe/executive dysfunction."  (*Id.*).  Defendant further "demonstrated impaired performance on several variables of the Wisconsin Card Sorting Test."  (*Id.*).

Dr. Ouaou then summarized the findings from his testing. (*Id.*). Dr. Ouaou opined that Defendant "put forth maximum effort on measures associated with malingering or feigning cognitive impairment." (*Id.*). Dr. Ouaou stated that Defendant "passed all indicators that he was giving genuine effort and the results are considered to be a valid and comprehensive summary of his intellectual and cognitive functioning." (*Id.*). Dr. Ouaou opined that Defendant "continued to exhibited [sic] cognitive deficits that are found in patients with acquired neurological injury or disease." (*Id.*). Dr. Ouaou opined that "[t]here were no significant changes in cognitive functioning when compared to the previous examination" and that "[i]f anything, scores related to processing speed are diminished when compared to 2014." (*Id.*). Dr. Ouaou's "continued assessment of Mr. Deruiter is that he [has] neuropsychological profile that is consistent with acquired brain damage related to traumatic brain injuries." (*Id.*). Dr. Ouaou stated that "[t]his was consistent with the medical record reviewed." (*Id.* at 6).

Dr. Ouaou diagnosed Defendant with Major Neurocognitive Disorder secondary to Traumatic Brain Injuries; ADHD, Severe; and History of Polysubstance Abuse. (*Id.*).

Dr. Ouaou also gave an opinion on Dr. Buigas' report and prior testimony. (*Id.* at 6-8). Dr. Ouaou wrote that he is "not persuaded by the findings and opinions of Dr. Buigas." (*Id.* at 6).

In sum, based on his neuropsychological assessments and a close review of the records, Dr. Ouaou opined "that Donnie Deruiter continues to lack the competency to proceed secondary to significant mental impairments delineated above." (*Id.* at 8). Dr. Ouaou stated that his opinions are given with a reasonable degree of psychological certainty. (*Id.*).

**E.      Forensic Re-Evaluation by Dr. Buigas, dated November 7, 2017**

Defendant was re-evaluated by Dr. Buigas at the Government's request pursuant to the Court's July 1, 2016 Order (Doc. 137).  Defendant was evaluated from July to August 2016. (Doc. 157 at 2).  Dr. Buigas completed a report dated November 7, 2016, which was filed under seal.  (Doc. 157).

During the re-examination, Defendant underwent psychological testing and clinical interviews by psychology staff, Dr. Buigas, and Ms. Diandra Calderin, M.S., a graduate psychology student under the supervision of Dr. Buigas.  (*Id.* at 3).  Dr. Buigas reviewed the additional medical records, court filings, and evaluations of record.  (*Id.*).  Dr. Buigas further described Defendant's updated history and a description of the offense.  (*Id.* at 3-4).  Dr. Buigas also noted Defendant's medical and psychiatric treatment while at the BOP.  (*Id.* at 6).

Dr. Buigas then discussed the findings from the re-evaluation.  (*Id.* at 5-7).  Dr. Buigas began by describing Defendant's behavior.  (*Id.* at 5).  Defendant was cooperative with the evaluation procedures and did not appear to have difficulty functioning in the structured environment of the institution.  (*Id.*).  Correctional staff reported that Defendant followed the rules and regulations of the institution without incident and that he completed adaptive living skills independently.  (*Id.*).

Dr. Buigas next described Defendant's then-current mental state.  (*Id.*).  Defendant was adequately dressed, groomed, and demonstrated proper hygiene.  (*Id.*).  Defendant's eye contact was appropriate and his facial expressions were congruent with verbalizations.  (*Id.*).  Defendant was reportedly cooperative despite some uncandid responses to questions.  (*Id.*).  Defendant was oriented to current and legal circumstances throughout the evaluation period.  (*Id.*).  Defendant's thought processes were logical and goal-directed, but circumstantial and overly detailed.  (*Id.*).

Defendant's attention and concentration were poor, requiring frequent redirection to remain on topic, but Defendant responded appropriately to prompts. (*Id.*). Defendant displayed adequate processing speed. (*Id.*). Dr. Buigas noted that "[t]hought content was reported as remarkable for hyperactivity, distractibility, learning difficulties, and somatic complaints." (*Id.*). Defendant "did not exhibit any delusional, obsessional, homicidal or suicidal ideations." (*Id.*). Defendant's memory appeared to be grossly intact for autobiographical recall and recent information. (*Id.*).

Dr. Buigas also noted that Defendant's speech pattern revealed normal volume and prosody with a variable rate that appeared pressured at times. (*Id.*). Defendant reportedly "demonstrated mild pragmatic issues such as interrupting another person speaking while speaking." (*Id.*). Dr. Buigas reported intact receptive language abilities, but Defendant sometimes needed repetitions. (*Id.*). Defendant's expressive language was verbose, but organized and appropriate. (*Id.*). Dr. Buigas estimated Defendant's intelligence to be at low to average levels. (*Id.*). Defendant's mood ranged from normal to mildly anxious and irritable. (*Id.*). Defendant "displayed a full range and intensity of emotional expression, and his affect was congruent with his verbalizations." (*Id.*). Defendant's "insight into his mental state and legal status and his judgment as to cause and effect relations were intact." (*Id.* at 5-6). Defendant's "mental status was consistent throughout the evaluation period." (*Id.* at 6).

Dr. Buigas next discussed the results from psychological testing. (*Id.* at 6-8). Dr. Buigas noted his results from his prior testing but indicated that "[w]henever possible, the repetitive administration of testing conducted by the author or other clinicians was avoided to minimize or avoid practice effects." (*Id.* 6-7). Dr. Buigas' testing evaluated cognitive functioning and psychological/personality functioning. (*Id.* at 7).

As to cognitive functioning, Dr. Buigas administered the Category Test to detect the presence of neuropsychological impairment such as that found in brain injuries or disease.  (*Id.*).  Defendant scored in the "Mildly [sic] Impairment" range of functioning.  (*Id.*).  Dr. Buigas noted, however, that Defendant's results were "suggestive of the exaggeration or fabrication of neurocognitive impairment on this measure."  (*Id.*).  Additionally, Defendant performed in the "Mild Impairment" range on the Speech-Sounds Perception Test and in the "Mild to Moderate Impairment" range on the Seashore Rhythm Test—measures of auditory attention and discrimination.  (*Id.*).

As to psychological/personality functioning, Defendant was administered the Personality Assessment Inventory ("PAI"), which is an objective measure of personality and psychiatric characteristics.  (*Id.*).  Dr. Buigas reported that Defendant "approached this measure with an exaggerated and infrequent level of symptom endorsement," which "rendered the measure invalid for clinical interpretation."  (*Id.*).  Defendant was also administered the SIRS-2 to detect the presence of malingering.  (*Id.*).  Unlike during the first evaluation, "Defendant's response pattern suggested genuine responding on this second administration of this measure."  (*Id.*).

"Given the defendant's response style on the objective measures," Dr. Buigas wrote that his subjective impressions of Defendant "should be viewed with caution."  (*Id.*).  Despite the disclaimer, Dr. Buigas wrote that Defendant's "view of his environment is realistic overall" and that Defendant "appears to be extroverted and has a variable self-concept."  (*Id.*).  Defendant "is prone to negative mood states such as anxiety, but does experience extended periods of euthymic mood.  Behaviorally, the defendant has difficulties with impulsivity, sustained persistence, asocial activities, and substance abuse."  (*Id.*).

Dr. Buigas made the following diagnoses:  Malingering; Attention-Deficit/Hyperactivity Disorder (ADHD), combined presentation, severe (provisional); Unspecified Opioid-Related Disorder; Unspecified Cannabis-Related Disorder; Unspecified Alcohol-Related Disorder; Unspecified Stimulant-Related (cocaine) Disorder; Adjustment Disorder with anxiety; and, Other Specified Personality Disorder (Mixed Borderline, Dependent, and Antisocial Personality Features).  (*Id.* at 8).  Dr. Buigas' treatment recommendations for Defendant remained the same as those outlined in the original report.  (*Id.* at 10).  Dr. Buigas opined that Defendant's prognosis is mixed and that Defendant's "current mental status appears relatively stable, but he does exhibit significant disturbances of attention."  (*Id.*).

Turing to the issue of competency, Dr. Buigas stated that his "evaluation for competency is designed to assess the defendant in several areas of courtroom knowledge and abilities.  This includes testing his ability to understand the courtroom proceedings, charges against him, and his ability to assist defense counsel."  (*Id.*).

Defendant's presentation of understanding the legal process was inconsistent.  (*Id.*).  Dr. Buigas administered two objective measures to test legal knowledge and abilities:  the Georgia Court Competency Test-Mississippi State Hospital ("GCCT-MSH") and the MacArthur Competence Assessment Tool-Criminal Adjudication ("MacCat-Ca").  (*Id.* at 11).  Defendant's performance was compared with the ECST-R administered during the initial evaluation.  (*Id.*).

On the GCCT-MSH, Defendant "achieved a score between persons feigning trial competency and persons determined incompetent by the Courts."  (*Id.*).

On the more comprehensive MacCat-Ca, Defendant displayed some variability in his scores.  (*Id.*).  This test measured three dimensions:  Understanding; Reasoning; and Appreciation.  (*Id.*).  Defendant achieved scores in the "Minimal/No Impairment" range for

Understanding and Reasoning.  (*Id.*).  Defendant scored in the "Mild Impairment" range for the Appreciation domain.  (*Id.*).  Dr. Buigas opined that Defendant's scores "are not suggestive of clinically significant impairment" and that the scores "appear to reflect mild impairment due to a pessimistic perception, but do not appear to have been adversely impaired by symptoms of a mental disease such as delusions."  (*Id.*).  Dr. Buigas opined that Defendant's current score on the MacCat-Ca is consistent with the previous findings from the ECST-R.  (*Id.*).

Defendant was also again administered the ILK.  (*Id.* at 12).  Dr. Buigas wrote that Defendant's "score was suggestive of the candid portrayal of knowledge related to competency to stand trial on this administration unlike the previous finding."  (*Id.* at 12).

In sum, Dr. Buigas opined that "[d]espite the defendant's attentional limitations, his current mental status is stable overall."  (*Id.*).  Dr. Buigas further opined that Defendant "appears to have an adequate level of understanding of the legal process and he did not demonstrate any symptoms of a mental illness that would interfere with an understanding of the legal process and his situation."  (*Id.*).  Dr. Buigas found that Defendant "demonstrated an ability to comport his behavior appropriately and engage in meaningful interactions, although his attorney may need to redirect his attention and utilize more concise communications."  (*Id.*).  Accordingly, Dr. Buigas "recommended that Mr. Deruiter be found Competent to Stand Trial."  (*Id.*).

**III.     Testimony from the March 7, 2017 *De Novo* Competency Hearing**

Because the Undersigned granted Defendant's request to conduct a *de novo* hearing that would include the additional medical records identified by Defendant, the Undersigned only evaluated the evidence and testimony as presented by the parties at the March 7-8, 2017 competency hearing.

A.      **Testimony by Dr. Ouaou**

Dr. Ouaou testified first at the *de novo* hearing.  (Doc. 202 at 12-20).  Dr. Ouaou began by describing his professional background, educational experience, and professional experience. (*Id.*).  Dr. Ouaou testified that neuropsychology is "the application of assessment and intervention in understanding human behavior as it relates to abnormalities of the central nervous system, so basically it's a way of getting at brain/behavior relations."  (*Id.* at 13:11-16).  Dr. Ouaou testified that he had performed roughly 250 forensic neuropsychological assessments and roughly 100 forensic psychological assessments.  (*Id.* at 16).  Dr. Ouaou further testified that he had appeared as an expert witness roughly 60 times—mostly as an expert in neuropsychology but also many times as an expert in clinical psychology.  (*Id.* at 19:11-15).  Dr. Ouaou was tendered without objection as an expert in neuropsychology and clinical psychology.  (*Id.* at 20). The Court accepted Dr. Ouaou as an expert in those two fields.  (*Id.*).

The Court notes that Dr. Ouaou was not initially tendered as an expert in forensic psychology.  (*See id.*).  When Dr. Ouaou began to testify as to his ultimate opinion on the issue of Defendant's competency, the Government objected to the opinion because Dr. Ouaou had not been tendered or accepted as an expert in "forensics, forensic neuropsychology, forensic psychology, or any forensic science."  (*Id.* at 78).  Defendant's counsel moved to have Dr. Ouaou accepted as an expert in forensic psychology.  (*Id.* at 79).  The Government challenged Dr. Ouaou's credentials and experience.  (*Id.* at 80).  Of note, Dr. Ouaou had no explanation why his *curriculum vitae* failed to include many of his forensic experiences and qualifications.  (*Id.* at 83).  For instance, Dr. Ouaou testified that he had received specialized training in forensic neuropsychology, but nevertheless conceded that his *curriculum vitae* was grammatically ambiguous on this point.  (*Id.*).  After *voir dire* and over the Government's continued objection,

the Court accepted Dr. Ouaou as an expert in forensic psychology and forensic neuropsychology. (*Id.* at 87).

Dr. Ouaou then described his original evaluation and his re-evaluation of Defendant.  (*Id.* at 21).  Dr. Ouaou testified that neuropsychology is a specialty field.  (*Id.*).  Dr. Ouaou testified that he conducted a forensic neuropsychological examination due to Defendant's reported history of head trauma.  (*Id.* at 22-23).  Dr. Ouaou examined Defendant on three occasions.  (*Id.* at 23). The first meeting on August 24, 2014 was an initial evaluation, while the meetings on November 3, 2014 and May 17, 2016 involved testing.  (*Id.* at 23).  Dr. Ouaou spent roughly 11 hours with Defendant in total during the examinations.  (*Id.* at 24).

Dr. Ouaou described the results from his testing.  (*Id.* at 25).  Dr. Ouaou testified that he conducts malingering assessments at the time of the evaluation to ensure that a defendant is giving full effort.  (*Id.*).  Dr. Ouaou testified that his malingering tests specifically detect neurocognitive malingering.  (*Id.*).  Dr. Ouaou testified that he gives stand-alone tests for malingering and assumes that cognitive measures are valid if those stand-alone tests are valid. (*Id.* at 27).  Dr. Ouaou administered three stand-alone tests for malingering and one embedded test for malingering.  (*Id.* at 28).  The three stand-alone tests were administered during both testing sessions.  (*Id.*).  Dr. Ouaou testified that practice effects – a form of error associated with familiarity with a test – are not applicable here due to the length of time between the two test sessions.  (*Id.*).  Dr. Ouaou testified that Defendant "passed all measures of symptom validity effort on neurocognitive testing on all occasions."  (*Id.*).

Dr. Ouaou further testified regarding Dr. Buigas' evaluations.  (*Id.* at 35).  Dr. Ouaou testified that only one examination given by Dr. Buigas tested for malingering of neuropsychological symptoms.  (*Id.*).  Dr. Ouaou testified that the Category Test administered by

Dr. Buigas is not ideal for determining neurocognitive malingering.  (*Id.* at 39).  Dr. Ouaou further stated that Dr. Buigas did not conduct any stand-alone tests, notwithstanding the apparent requirement by National Academy of Neuropsychology to do so.  (*Id.* at 40).  Dr. Ouaou testified that administering other tests without stand-alone malingering tests as part of the same battery of tests raises questions about the accuracy of Dr. Buigas' testing.  (*Id.* at 42-43).  Apart from these issues, Dr. Ouaou stated that Dr. Buigas' testing helped to validate his findings because Defendant "passed all measures of symptom validity effort on neurocognitive testing," even on Dr. Buigas' testing.  (*Id.*).  Furthermore, Dr. Ouaou testified that his lack of testing for psychiatric malingering does not affect his opinion that Defendant gave maximum effort because psychiatric malingering testing is not a valid way "of getting at whether or not someone is performing maximum effort on a cognitive test."  (*Id.* at 45).

Dr. Ouaou testified that he diagnosed Defendant with major neurocognitive disorder secondary to brain injury in November 2014.  (*Id.* at 30).  Dr. Ouaou stated that his opinion was valid without having any additional medical records (*id.*), and that additional medical records "add to the conclusions" but are not necessary to corroborate results.  (*Id.* at 74).

Dr. Ouaou testified that he personally administered all testing.  (*Id.* at 46).  Dr. Ouaou testified that administering testing over a series of days or weeks instead of during a single session only serves to increase the error variance in test results.  (*Id.* at 47).

Dr. Ouaou summarized the results of his testing, discussed *supra*.  (*Id.* at 49).  In pertinent part, Dr. Ouaou stated that the results could be grouped into two categories, intellectual functioning and cognitive functions.  (*Id.*).  As to intellectual functioning, Dr. Ouaou testified that Defendant has "significant diminished general intellect that has been acquired."  (*Id.* at 53).  As to cognitive functions, Dr. Ouaou testified that Defendant has "rather severe defects in

attention, concentration, and processing speed, in addition to some memory defects as well." (*Id.* at 58:20-22). Dr. Ouaou testified that results from the May 2016 testing were worse in some respects but his conclusions for Defendant's level of impairment were the same. (*Id.*).

Dr. Ouaou further testified that Defendant's issues with following and processing information directly affect his ability to consult with his lawyer and make fully informed decisions. (*Id.* at 61). Dr. Ouaou stated that Defendant has severe processing deficits. (*Id.*). Moreover, while Defendant's attention issues could potentially be treated with medication, Dr. Ouaou testified that Defendant's memory problems are incurable. (*Id.* at 62). Dr. Ouaou testified that Defendant's brain is permanently damaged. (*Id.* at 77).

Based on his neurocognitive evaluation, review of the medical records, the initial conversation with counsel, his interview with Defendant, and a review of Dr. Buigas' reports and data, Dr. Ouaou opined that Defendant is not competent because Defendant is unable to assist counsel due to his neurocognitive defects. (*Id.* at 88).

On cross-examination, Dr. Ouaou conceded that someone can suffer from a neuropsychological impairment, yet still be competent to proceed. (*Id.* at 98). Dr. Ouaou further conceded that the question of whether someone is competent is different than the question of whether someone has a neuropsychological impairment. (*Id.* at 99). Additionally, although he stated that his examination was a forensic neuropsychological evaluation (*id.* at 101), Dr. Ouaou conceded that he did not specifically conduct any forensic tests (*id.* at 102).

Dr. Ouaou also testified regarding the additional medical records. (*Id.* at 111-15). Dr. Ouaou appeared to concede that the additional medical records did not satisfy all the criteria for a diagnosis of major neurocognitive disorder secondary to traumatic brain injury under the Diagnostic and Statistical Manual of Mental Disorders-Fifth Edition ("DSM-5"). (*Id.*).

Additionally, Dr. Ouaou testified that the medical records demonstrated that Defendant has drug-seeking behaviors. (*Id.* at 118). Dr. Ouaou testified that drug-seeking behavior is consistent with malingering because someone is "faking something" to get something else that is favorable. (*Id.* at 119). Dr. Ouaou testified that objective tests such as CAT scans can reveal head injuries, but that the scans in Defendant's medical records were negative. (*Id.* at 120). Nevertheless, Dr. Ouaou reiterated his opinion that medical records were not necessary because Defendant demonstrated the same cognitive deficits in 2014 and 2016. (*See id.* at 122). Dr. Ouaou stated that his report did not otherwise use the additional medical records. (*Id.* at 123).

Dr. Ouaou conceded that "somebody who is impaired to the level where they can't have a conversation with their lawyer about their case" would usually have issues with daily living. (*Id.* at 130). Dr. Ouaou further conceded that Defendant can live on his own and can interact with a roommate. (*Id.* at 131). Dr. Ouaou also testified that while Defendant had difficulty completing the examinations, he was able to get through all of the testing with breaks. (*Id.* at 136). Dr. Ouaou stated that Defendant could successfully be redirected on topic. (*Id.*).

On re-direct, Dr. Ouaou again testified that the additional medical records were helpful but not necessary. (*Id.* at 143). Dr. Ouaou testified that the medical records help confirm his conclusions that the records "documented multiple head injuries, and we know from that diagnosis that multiple mild head injuries even cause persistent neurocognitive deficits." (*Id.*).

### B.     Testimony by Dr. Buigas

Dr. Buigas testified second at the hearing. ([Doc. 202 at 147](#)). Dr. Buigas was questioned regarding his background, educational experiences, and professional experiences. (*Id.* at 147-61). Dr. Buigas outlined his extensive background in forensic psychology including a one-year internship and a post-doctoral program in forensic psychology. (*Id.*). Dr. Buigas also testified

that he teaches classes in forensic psychology and neuropsychology.  (*Id.* at 149).  Dr. Buigas testified that his private practice is "overwhelming in neuropsychology for civil matters."  (*Id.* at 152).  Dr. Buigas stated that he has testified more than 200 times as an expert in forensic psychology and has also testified as an expert in neuropsychology on occasion.  (*Id.* at 155-56).  Dr. Buigas was tendered as an expert in forensic psychology and neuropsychology.  (*Id.* at 161).  Over Defendant's objection as to Dr. Buigas' expertise in neuropsychology, the Court accepted Dr. Buigas as an expert in forensic psychology and neuropsychology.  (*Id.* at 162).

Dr. Buigas testified that "forensic psychology is basically applying a science to a legal question."  (*Id.* at 163).  Dr. Buigas testified that "forensics more often than not . . . involves some level of a determination for cognitive functioning, up to and including a comprehensive neuropsychological evaluation."  (*Id.*).

Dr. Buigas testified regarding his evaluations of Defendant and the reports he submitted to the Court, discussed *supra*.  (*Id.* at 164).  Dr. Buigas stated that Defendant was housed at FDC Miami for roughly a month on two occasions.  (*Id.* at 165).  Dr. Buigas testified that the second evaluation involved 6-7 hours of direct meetings with additional contacts by graduate students under his supervision.  (*Id.* at 166).  Although graduate students conducted some interviews and testing, Dr. Buigas testified that he never deferred to their judgments.  (*Id.* at 170).  Dr. Buigas also testified that correctional staff observed Defendant.  (*Id.* at 172).  Dr. Buigas stated that Defendant underwent routine physical examinations during both evaluations.  (*Id.* at 176).  Defendant denied a history of head injuries on both occasions.  (*Id.* at 177).

Dr. Buigas discussed the results from his testing.  (*Id.* at 177).  Dr. Buigas administered tests to evaluate three domains:  legal, psychiatric, and cognitive.  (*Id.* at 177-78).  Dr. Buigas administered malingering tests for all three domains.  (*Id.* at 179).  Dr. Buigas testified that there

is no difference between embedded indices of malingering versus stand-alone assessments.  (*Id.* at 189).  Dr. Buigas discussed the impact of practice effects, stating that the effect is rarely studied for individual tests, but that he tries to avoid practice effects.  (*Id.* at 178).

Dr. Buigas first described the testing results for the legal domain.  (*Id.* at 183).  On the ECST-R given during the first evaluation, Dr. Buigas noted that Defendant had normal findings on two measures and moderate impairment on another.  (*Id.* at 186).  The results indicated, however, that Defendant was malingering.  (*Id.*).  On the ILK, Defendant's results on the first examination suggested malingering while the second evaluation did not suggest that Defendant was "faking legal knowledge."  (*Id.* at 187).  On the GCCT-MSH, Defendant scored in the "incompetent" range, but Defendant's results suggested malingering of psychiatric symptoms. (*Id.* 189-90).  On the MacCat-Ca, Dr. Buigas testified that the test evaluates competency by measuring understanding, reasoning, and appreciation.  (*Id.* at 191).  Defendant had no impairment on understanding or reasoning, but did demonstrate mild impairment on appreciation.  (*Id.* at 192).  Dr. Buigas noted, however, that the ability to assist counsel is associated with reasoning and there was "no impairment whatsoever."  (*Id.* at 192:3-5).

For the psychiatric domain, Dr. Buigas noted that the MMPI was rendered invalid for clinical interpretation due to malingering.  (*Id.* at 194).  Dr. Buigas testified that he typically does not give additional tests in a particular domain if test results show a defendant to be malingering. (*Id.*).  In the first evaluation, despite the presence of malingering, Dr. Buigas administered the SIRS-2.  (*Id.* at 195).  This test, however, also showed Defendant to be malingering.  (*Id.* at 195). On the second evaluation, however, Defendant's SIRS-2 results were genuine.  (*Id.* at 196).  On the PAI, Dr. Buigas testified that Defendant invalidated the test.  (*Id.*).

In the cognitive domain, Defendant was administered four tests in the first evaluation. (*Id.* at 200). On the Booklet Category Test, Defendant scored in the low average range, but his results were suggestive of malingering. (*Id.* at 201). Dr. Buigas testified that these test results are "specific to faking cognitive impairment following a [traumatic brain injury]." (*Id.* at 202:2-3). On the visual vigilance test, Defendant scored in the mild to moderate impairment range on timing and above average on errors. (*Id.*). For the NAB-Attention Module, Defendant scored in the moderate to severe impairment range for attention. (*Id.* at 203). Defendant also took the VIP, which showed his scores to be "inconsistent" on the nonverbal portion, suggestive of poor effort. (*Id.* at 204). For the verbal portion, Defendant scored in the "suppressed" range, suggestive of malingering. (*Id.*).

In the most recent evaluation, Dr. Buigas administered several more tests. (*Id.* at 205). For the Speech-Sound Perception Test, Defendant achieved a score of "mild impairment." (*Id.*). For the Seashore Rhythm Test, Defendant scored in the "mild to moderate impairment" range. (*Id.* at 206). On the Category Test – an executive function test with embedded indices of malingering – Defendant's results were suggestive of malingering, despite what might be expected from practice effects. (*Id.* at 207).

Dr. Buigas testified that the results of his testing during both evaluations suggested that Defendant was malingering. (*Id.* at 208-209).

In total, Dr. Buigas testified that his opinion at the time of both evaluations was that Defendant was competent to stand trial. (*Id.* at 214). Dr. Buigas testified that his continued opinion is that Defendant is competent to stand trial. (*Id.*).

Dr. Buigas then discussed his review of the additional medical records. (*Id.*). Dr. Buigas testified that the medical records from Maimonides Hospital do not support a diagnosis of

traumatic brain injury. (*Id.* at 218). As to the records from Naples Community Hospital, Dr. Buigas testified that there were no indications of traumatic brain injury in these records. (*See id.* at 222). Additionally, Dr. Buigas testified that the records are consistent with his diagnosis of drug-seeking behavior. (*Id.* at 230). Dr. Buigas further testified that drug-seeking behavior is consistent with and/or similar to malingering because someone is faking a condition for secondary gain. (*Id.*). In sum, Dr. Buigas testified that the medical records corroborated his conclusion that there is no indication of traumatic brain injury, at least as defined by the DSM-5. (*Id.* at 233).

Dr. Buigas further testified that is it unlikely that someone who is "suffering from injuries so significant that they cannot communicate with their lawyer" would be able to refurbish computers for a living. (*Id.* at 236). Dr. Buigas testified that the thirty-day evaluations he conducted are more thorough and comprehensive than evaluations conducted in a single day. (*Id.* at 239). Dr. Buigas testified that Defendant successfully completed all testing and was able to be redirected when necessary. (*Id.* at 243). Dr. Buigas testified that Defendant's attention issues can be ameliorated with medication. (*Id.* at 244).

On cross-examination, Dr. Buigas conceded that he did not know if practice effects had any impact on Defendant's testing results. (*Id.* at 254). Dr. Buigas testified that he believed his charge in conducting a second evaluation was to conduct a holistic evaluation of Defendant. (*Id.* at 263). Dr. Buigas also testified that he did not administer a reading test to Defendant. (*Id.* at 267). Additionally, Dr. Buigas conceded that despite Defendant's claims of neurocognitive disorder secondary to traumatic brain injury, he did not test for IQ or premorbid IQ. (*Id.* at 268). Instead, Dr. Buigas stated that he tested for the legal question—*i.e.*, competency. (*Id.* at 271).

Dr. Buigas also conceded that Dr. Ouaou could have diagnosed Defendant with major neurocognitive disorder secondary to brain injury without corroborating medical records.  (*Id.* at 277-78).  Dr. Buigas testified that in his opinion other diagnoses would have been more appropriate.  (*Id.*).  Dr. Buigas also conceded that he never conducted a stand-alone test for malingering nor a comprehensive neuropsychological examination.  (*Id.* at 291-92).

On re-direct, Dr. Buigas testified that he evaluated Defendant personally for 5 hours at the first evaluation with the total time between Dr. Buigas and his staff being 10.5 hours.  (*Id.* at 299).  Dr. Buigas reiterated his opinion that the medical records do not support a diagnosis of traumatic brain injury under the DSM.  (*Id.* at 300).  Finally, Dr. Buigas testified that while he did not personally administer all tests, he evaluated all of Defendant's test results.  (*Id.*).

On re-cross, Dr. Buigas testified that corroborating etiology is important.  (*Id.* at 301).

## IV.    Arguments by Counsel

After the expert testimony, counsel offered the following during oral argument.

### A.    Defendant's Argument

Defendant does not dispute that he can understand the nature of the proceedings against him.  (Doc. 200 at 40).  Instead, Defendant contends that he has significant neuropsychological issues that prevent him from having a sufficient present ability to consult with his attorney and assist in his own defense.  (*Id.* at 39-40).  Defendant specifically contends that he has issues with attention and memory resulting from organic brain injury.  (*Id.* at 10).  Defendant concedes that his attention problems are amenable to treatment by medication.  (*Id.*).  Defendant argues, however, that his memory problems are untreatable.  (*Id.*).

Defendant further contends that only Dr. Ouaou specifically addressed his neuropsychological issues.  (*See id.* at 3).  Defendant points out that only Dr. Ouaou

administered a comprehensive neurophysiological battery of tests.  (*Id.*).  Defendant contends

that Dr. Buigas' failure to conduct a comprehensive examination of Defendant's neurological

functions "is devastating to the government's contention that Mr. Deruiter is competent."  (*Id.* at

3-4).  Specifically, because Dr. Buigas never conducted a neuropsychological battery of tests,

Defendant argues that Dr. Buigas never ruled out the possibility that Defendant has

neurocognitive disorders.  (*Id.* at 16-17).  Thus, Defendant argues that Dr. Buigas' failure to

conduct a comprehensive neurophysiological evaluation – despite his ability to do so – renders

Dr. Buigas' evaluations and reports less credible than Dr. Ouaou's.  (*See id.* at 8-12).  Defendant

contends that the "the diversity of testimony of the experts is far, far too great" to weigh the

experts equally.  (*Id.* at 16).

Defendant further contends that Dr. Buigas' approach was deficient.  (*See id.*).

Defendant specifically takes issue with Dr. Buigas' failure to conduct a stand-alone assessment

for malingering of a cognitive disorder.  (*Id.* at 20).  Defendant further relies upon Dr. Ouaou's

opinion that all testing should be conducted in one day instead of over a longer period of time.

(*Id.* at 17).  Defendant argues that one of the experts must be wrong, and that it is Dr. Buigas.

(*Id.* at 18).  Defendant argues that Dr. Buigas' shortcomings in this case are severe—analogous

to a master chef being unable to turn on a stove.  (*Id.*).

Additionally, as to the additional medical records that necessitated the current re-review

of Defendant's competency, Defendant argues that the records from Maimonides Hospital

provide the strongest inference that Defendant, in fact, suffered a traumatic brain injury.  (*Id.* at

14-15).

B.      **Government's Argument**

In response, the Government argues that the burden is on the Defendant pursuant to

*United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011).  (Doc. 200 at 22).  Moreover, pursuant

to *United States v. Hogan*, 986 F.2d 1364 (11th Cir. 1993), the Government contends that "even

perfectly competent defendants often do not fully comprehend the intricacies of some of the

defensive theories offered by their lawyers.  That level of comprehension is not a requirement of

competency."  (Doc. 200 at 23).

Further, the Government suggests that there are two issues for the Court to review in this

case.  (*Id.*).  The first issue is whether the additional medical records that necessitated the Court's

re-review changed anything.  (*Id.*).  The second issue is whether there was any new evidence

presented that would change the Court's prior analysis.  (*Id.*).

On the first issue, the Government argues that the additional medical records "not only

don't lend credence to the diagnosis of traumatic brain injury, but actually indicate that it's

evident that he did not sustain a traumatic brain injury."  (*Id.* at 24).  Further, to the extent the

records are ambiguous as to whether Defendant sustained a traumatic brain injury, the

Government argues that ambiguity "cuts against the defendant" because the burden rests with

him.  (*Id.*).  The Government argues that the medical records do not demonstrate any significant

injury.  (*See id.* at 28).  In fact, the Government contends that the objective evidence here

suggests malingering.  (*Id.* at 27).  Thus, the Government argues that the medical records fail to

support a diagnosis of traumatic brain injury.  (*Id.*).

Further, the Government contends that any head injury the defendant may have sustained

"is so subtle that it can't be picked up by [objective] screening measures" such as CAT scans, x-

rays, and multiple screenings.  (*Id.* at 29).  The Government questions how the alleged head

injury could be "so subtle" that it is not picked up by objective tests but "so major that it's now impacting his ability to even have a conversation with his lawyer." (*Id.*). The Government also argues that "the magnitude of this head injury is not to the extent that would be required under the DSM-5" to support Dr. Ouaou's diagnosis. (*Id.*). The Government also points out that Dr. Ouaou conceded that a diagnosis of traumatic brain injury does not necessarily equate to incompetency. (*Id.* at 30).

On the second issue, the Government argues that nothing should change the Court's prior analysis. (*See id.* at 30). In support, the Government argues that there are five reasons that Dr. Buigas should be considered more credible. (*Id.* at 31). First, the Government contends that Dr. Buigas' forensic credentials are superior to Dr. Ouaou's. (*Id.*). Second, the Government argues that Dr. Ouaou admitted that he did not conduct a *forensic* analysis, but instead conducted a neuropsychological assessment. (*Id.* at 32-33). The Government argues that Dr. Ouaou made a significant, unfounded "jump" from the neuropsychological assessment to his forensic legal conclusion. (*See id.* at 33-34). Third, the Government argues that Dr. Ouaou gave more repeat tests than Dr. Buigas and, thus, his testing is more susceptible to practice effects. (*Id.* at 34). Fourth, the Government argues that Dr. Buigas' report is far more thorough than Dr. Ouaou's report. (*Id.* at 34-35). Finally, the Government argues that, pursuant to the DSM-5, the medical records fail to support Dr. Ouaou's diagnosis of traumatic brain injury. (*Id.* at 36).

Additionally, the Government argues that there is now more evidence supporting the conclusion that Defendant is competent to proceed. (*Id.* at 37). The Government states that Dr. Buigas found Defendant to be malingering again. (*Id.*). The Government further points out that "Dr. Ouaou testified that he wouldn't expect to see the defendant holding a position as refurbishing computers if he was suffering from a traumatic brain injury that was so severe that it

would render him incapable of having a meaningful conversation with his lawyer about his own defense." (*Id.* at 37:16-21). The Government argues that the ultimate issue is whether Defendant is competent to stand trial. (*Id.* at 38). Here, the Government contends that only Dr. Buigas specifically tested for this issue, and he found that Defendant is competent. (*Id.*).

## V.    Analysis

The Undersigned next analyzes Defendant's claim that he is not competent to stand trial in view of the foregoing record evidence and testimony.

### A.    Legal Standard

"[T]he Constitution does not permit trial of an individual who lacks 'mental competency.'" *Indiana v. Edwards*, 554 U.S. 164, 170 (2008). The federal competency standard is codified in 18 U.S.C. § 4241. The statute provides:

> If after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d).

The standard to determine mental competency to stand trial "is whether the defendant ha[s] 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he ha[s] 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Nickels*, 324 F.3d 1250, 1252 (11th Cir. 2003) (citing *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986)). Accordingly, to be mentally incompetent to stand trial, Defendant must suffer from a mental disease or defect such that he is unable (1) to understand the nature and consequences of the proceedings against him or (2) to assist properly in his defense. 18 U.S.C. § 4241(d). Low intelligence and weird behavior

do not necessarily equate with mental incompetency to stand trial. *McCune v. Estelle*, 534 F.2d 611, 612 (5th Cir. 1976).[4]

In determining whether Defendant has a mental disease or defect such that he is unable to assist properly in his defense, the competency statute is silent as to which party bears the burden of proof. *See* 18 U.S.C. § 4241(d); *but see United States v. Izquierdo*, 448 F.3d 1269, 1277-78 (11th Cir. 2006) (stating upon review of the defendant's motion to withdraw a guilty plea based on incompetency that "the relevant competency statue arguably contemplates that the burden will lie with the party making a motion to determine competency"). Currently, there is some question regarding where the burden of proving competency to stand trial lies in federal criminal proceedings. *See United States v. Merriweather*, No. 2:07-CR-243-RDP-JEO, 2014 WL 5770213, at *41-42 (N.D. Ala. Nov. 5, 2014) (allocating the burden of proof to the Government based on an express offer by the Government to assume the burden of proving competency).

Former Fifth Circuit precedent indicates that "[t]here can be no question that in federal criminal cases the government has the burden of proving [a] defendant competent to stand trial at the [competency] hearing." *United States v. Makris*, 535 F.2d 899, 906 (5th Cir. 1976) (upon review of a pre-trial motion to determine competency). The Eleventh Circuit, however, has subsequently indicated that, despite earlier precedent tending to show the contrary, *see id.* at 905-906, "we have since decided that 'a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence.'" *Bradley*, 644 F.3d at 1268 (citing *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995)). Additionally, the Supreme Court has indicated, albeit in

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

dicta, that the burden of establishing incompetence rests with the defendant. *Izquierdo*, 448 F.3d at 1277 (citing *Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996) for the proposition that "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence.").

In the present case, the Undersigned finds that the Eleventh Circuit's *Bradley* decision controls. *See Bradley*, 644 F.3d at 1268. *Bradley* specifically addresses and distinguishes the former Fifth Circuit's decision in *Makris* and, thus, appears to abrogate *Makris* by placing the burden of proving incompetence on the defendant. *See id.* Thus, the burden of proving incompetence rests with Defendant such that Defendant must prove his incompetency by a preponderance of the evidence. *See id.*; 18 U.S.C. § 4241(d).

In deciding the issues in this case, however, the preponderance of the evidence shows that Defendant is competent and that the case should proceed to trial. Even though there may be a question as to who bears the burden, the evidence of competency in this case is not in equipoise and, thus, the Undersigned finds that allocating the burden to the Defendant does not alter the outcome of the competency determination. *See Merriweather*, 2014 WL 5770213, at *42.

### B.    Weight of Expert Testimony

The preponderance of the evidence standard requires the Court to determine "that the existence of [the] fact is more probable than its nonexistence." *In re Winship*, 397 U.S. 358, 371 (1970). In evaluating the expert evidence and testimony, the Court is free to assign appropriate weight to the expert opinions it receives. *See Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005). When the Court receives expert opinions with differing conclusions, it does not err "simply by crediting one opinion over another where other record evidence exists to support the conclusion." *Id.* (citing *Johnston v. Singletary*, 162 F.3d 630, 639 (11th Cir. 1998)).

Additionally, "[d]octors must remember that he or she is presenting an informed opinion, not a fact, and they should not be invested in any particular outcome." *United States v. Carter*, No. 1:12-CR-29, 2013 WL 6668715, at *12 (E.D. Tenn. Dec. 18, 2013). Here, the Undersigned concludes that the opinions of both experts are sincerely held within their areas of expertise and that the professional credibility of each expert was not successfully challenged by either party at the hearing.

Nevertheless, while the professional credibility of either expert was not challenged, the Undersigned gives more weight to the opinion of Dr. Buigas due to his superior qualifications in forensic psychology and, thus, in addressing the specific question at issue—*i.e.*, Defendant's competency. In connection with the *de novo* hearing, the parties invested a great deal more effort than before in distinguishing the experts' respective qualifications and experience. Specifically, the record shows that Dr. Buigas took specialized classes in forensic psychology including a one-year internship and a post-doctoral program in forensic psychology. (Doc. 202 at 148). Additionally, Dr. Buigas currently teaches classes in forensic psychology. (*Id.* at 149). Conversely, the record shows that Dr. Ouaou has not received the same level of specialized training as Dr. Buigas. (*See id.* at 83). Moreover, even though Dr. Ouaou was called upon to testify as an expert in forensic psychology, his *curriculum vitae* omits many of his forensic experiences. (*Id.*). When questioned on this, Dr. Ouaou did not offer an explanation. (*Id.*). Moreover, although Dr. Ouaou testified that he had in fact received specialized training in forensic neuropsychology, his *curriculum vitae* was vague and confusing on this point. (*Id.* at 84). Taken together, the Undersigned concludes that Dr. Buigas' opinion is entitled to more weight because of his superior qualifications in forensic psychology.

It warrants mentioning that although Dr. Ouaou clearly has a great deal of experience in neuropsychology, the Undersigned does not find that this experience entitles his opinion to greater weight in deciding the issue of Defendant's competency.  Dr. Buigas also has a great deal of experience in neuropsychology.  In fact, Dr. Buigas testified that he teaches classes in neuropsychology, (*id.* at 149), and that his private practice is "overwhelming in neuropsychology for civil matters," (*id.* at 152).

Furthermore, the Undersigned notes that the specific question here is Defendant's legal competency.  Dr. Ouaou, however, only evaluated Defendant's alleged neuropsychological issues.  (*See id.* at 102).  Dr. Ouaou did not administer any forensic testing.  (*Id.*).  After finding that Defendant had significant neuropsychological deficits, Dr. Ouaou determined that Defendant was incompetent to proceed based on those deficits.  (*See, e.g.*, Doc. 124 at 8).  Dr. Ouaou conceded, however, that someone can suffer from neuropsychological impairments, yet still be competent to proceed.  (Doc. 202 at 98).  Both experts evaluated Defendant as he was, but only Dr. Buigas specifically used objective forensic testing.  (*See id.* at 187-92).  The Undersigned finds that Dr. Ouaou's opinions are entitled to less weight than Dr. Buigas' for this reason.

The Undersigned further notes that Defendant takes issue with several aspects of Dr. Buigas' evaluations.  For instance, Defendant objects to Dr. Buigas' failure to conduct a comprehensive neuropsychological evaluation.  (Doc. 200 at 4).  Additionally, citing Dr. Ouaou's opinion and testimony, Defendant argues that testing should be conducted as a battery of tests in one day instead of being conducted over a longer period of time.  (*Id.* at 16-18).  Similarly, Defendant argues that stand-alone assessments are better than embedded measures at determining malingering.  (*Id.* at 20).  However, Dr. Buigas disagrees with Dr. Ouaou on these points.  Upon review, the Undersigned finds that neither expert has demonstrated that his

approach is necessarily superior to the other, as applied in this case.  Thus, the Undersigned declines to credit one experts' opinion over the other on any of these additional grounds.

Moreover, the Undersigned does not weigh Dr. Buigas' opinion less due to the fact that graduate students assisted in the evaluation.  Dr. Buigas testified that he never defers to the judgment of graduate students who assist him.  (Doc. 202 at 170).

Regarding the relative durations of the experts' respective evaluations, courts have given more weight to evaluations conducted over a longer period of time.  *See, e.g.*, *Carter*, 2013 WL 6668715, at *3, 13 (according less weight to the evaluation conducted in the shortest amount of time).  This Court previously gave more weight to the opinion of Dr. Buigas due, in part, to the greater time he spent with Defendant.  Since then, however, both experts have spent significant additional time with the Defendant that each expert deemed appropriate under the circumstances.  As a result, the Undersigned does not afford greater weight to either expert's opinion based solely on the duration of their respective evaluations of the Defendant.

For the reasons articulated above, the Undersigned finds that Dr. Buigas' opinion is entitled to greater weight regarding the issue of Defendant's competency.

### C.      Defendant's Competence

As stated above, the competency standard requires the Court to determine whether Defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to (1) understand the nature and consequences of the proceedings against him or (2) assist properly in his defense.  18 U.S.C. § 4241(d).  The Undersigned addresses each of these issues in turn below.

**1.**      **Ability to understand the nature and consequences of the proceedings against him**

The first prong of the competency standard is not contested.  Here, both experts opined that Defendant is able to understand the nature and consequences of the proceedings against him.  Specifically, Dr. Ouaou wrote in his initial report that Defendant "understands the adversarial nature of the legal process and the roles of a jury or attorney . . . ."  (Doc 23-1 at 8).  Similarly, Dr. Buigas opined that Defendant "has an adequate level of understanding of the legal process and he did not demonstrate any symptoms of a mental illness that would interfere with an understanding of the legal process and his situation."  (Doc. 59 at 12).  Upon re-evaluation, Dr. Buigas wrote that Defendant "appears to have an adequate level of understanding of the legal process and he did not demonstrate any symptoms of a mental illness that would interfere with an understanding of the legal process and his situation."  (Doc. 157 at 12).  Moreover, Defendant does not dispute that he understands the nature and consequences of the proceedings against him.  (Doc. 200 at 38-40).

Accordingly, because the experts and the parties agree, the Undersigned finds that Defendant is not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him.  *See* 18 U.S.C. § 4241(d).

**2.**      **Ability to assist properly in his defense**

As before, the primary issue is whether Defendant can "assist properly in his defense." *See id.*  On this point, the parties continue to have stark disagreements.  On the one hand, Defendant contends that he has significant neuropsychological issues resulting from a traumatic brain injury that prevent him from having a sufficient present ability to consult with his attorney and assist in his own defense.  (Doc. 200 at 10, 39-40).  On the other hand, the Government

contends that whatever head injury Defendant may have had, if any, does not interfere with his ability to assist in his defense and that Defendant is malingering.  (*Id.* at 27, 29, 37).

In this regard, the Court must consider:  (1) the parties' competing positions as to Defendant's allegations of traumatic brain injury; (2) Defendant's low IQ; (3) Defendant's attention deficits; (4) Defendant's memory deficits; and (5) these impairments in combination.

i.        *Traumatic Brain Injury*

As a threshold matter, the parties disagree concerning Defendant's allegations of traumatic brain injury.  Defendant's primary contention is that he has significant neuropsychological issues resulting from a traumatic brain injury that prevent him from having a sufficient present ability to consult with his attorney and assist in his own defense.  (Doc. 200 at 10, 39-40).  In this regard, Dr. Ouaou specifically diagnosed Defendant with "Major Neurocognitive Disorder secondary to Traumatic Brain Injuries."  (Doc. 23-1 at 7; Doc. 124 at 6).  As elicited at the *de novo* hearing, the DSM-5 establishes specific criteria for such a diagnosis.  (Government's Exhibit No. 8, Doc. 193-5 at 2).  These criteria include:  (1) loss of consciousness; (2) posttraumatic amnesia; (3) disorientation and confusion; and (4) neurological signs.  (*Id.*).  Moreover, the neurocognitive disorder must present immediately after the occurrence of traumatic brain injury.  (*Id.*).  Upon review of these criteria, however, the Undersigned finds that the record does not support Dr. Ouaou's diagnosis.

In the previous Report and Recommendation, the Undersigned stated, "[b]ased on the testing administered, Dr. Ouaou attributed Defendant's impairments to an organic brain injury. However, other than self-reported data from Defendant and the results of his testing, Dr. Ouaou had no other evidence that any traumatic injury ever occurred."  (Doc. 85 at 34 (internal citations omitted)).  The Undersigned notes that it was the existence of additional medical records not

previously considered by the Court or the experts that caused Defendant's competency proceedings to be re-opened.  (Doc. 107 at 4).  Here, however, even after the experts and the parties reviewed the additional medical records, the additional medical records do not support a diagnosis of traumatic brain injury.

When questioned at the *de novo* hearing, Dr. Ouaou appeared to concede that the additional medical records did not directly support his diagnosis of major neurocognitive disorder due to traumatic brain injury pursuant to the standard of the DSM-5.  (Doc. 202 at 111-15).  Dr. Ouaou conceded that the Maimonides records, for example, did not show loss of consciousness, posttraumatic amnesia, or disorientation and confusion.  (*Id.* at 111-14).  The records also did not show that the neurocognitive disorder presented immediately after the occurrence of traumatic brain injury.  (*Id.* at 114).  Moreover, as to the records from North Collier Hospital, while Dr. Ouaou stated that a documented posttraumatic headache from those records could be considered a "neurological sign," Dr. Ouaou conceded that the records did not otherwise confirm the DSM-5 criteria.  (*Id.* at 115).  Likewise, while objective tests can reveal the presence of a head injury, Dr. Ouaou testified that the objective tests referenced in Defendant's additional medical records were negative.  (*Id.* at 120).

For his part, Dr. Buigas specifically testified that the additional medical records do not support a diagnosis of traumatic brain injury.  (*Id.* at 218-22).

While Dr. Ouaou has consistently testified that the additional medical records are helpful but not necessary to make a diagnosis of traumatic brain injury (*id.* at 143), the Undersigned finds that the evidentiary record here, including the additional medical records, does not provide adequate support for Dr. Ouaou's diagnosis of Major Neurocognitive Disorder secondary to Traumatic Brain Injuries pursuant to the DSM-5.  The evidentiary record contains no objective

medical records sufficient to confirm Dr. Ouaou's diagnosis under the DSM-5. Accordingly, because Dr. Ouaou's diagnosis of Major Neurocognitive Disorder secondary to Traumatic Brain Injuries is not adequately supported by the record – even considering the voluminous additional medical records tendered by the Defendant – Dr. Ouaou's conclusion that Defendant is incompetent to proceed on that basis is also not supported.

*ii.*    *Low IQ*

The Undersigned next addresses Defendant's low IQ. Upon review, the evidentiary record supports a finding that Defendant has a low IQ. (*See* Doc. 23-1). For instance, testing from Dr. Ouaou's first evaluation showed that Defendant has a Full Scale IQ of 82, placing him in the low average range at the 12th percentile. (*Id.* at 3).

Notwithstanding this finding, however, Defendant did not argue at the *de novo* competency hearing that his low IQ renders him incompetent. (*See* Doc. 200). Instead, Defendant argued that his attention and memory deficits render him incompetent. (*Id.* at 10). Moreover, neither expert opined that Defendant's IQ renders him incompetent to proceed. Thus, the record does not support a finding that Defendant is incompetent based on his low IQ.

Furthermore, a review of relevant case law demonstrates that a low IQ does not necessarily render a defendant incompetent to proceed. For instance, in *United States v. Glover*, the defendant had an intelligence level in the bottom one percentile of society, had memory problems, and suffered from a short attention span. 596 F.2d 857, 864-65 (9th Cir. 1979). There, experts opined that the defendant would only be competent to stand trial if questions, terms, and proceedings were explained to him in very simple terms, using concrete examples. *Id.* at 865. Despite these issues, the Ninth Circuit upheld a finding of competency stating that "[t]he fact that a defendant might not understand the proceedings unless they are explained to

53

him in simple language would put an additional burden upon counsel, but certainly does not establish that the defendant is incompetent to stand trial." *Id.* at 867.

Similarly, in *United States v. Carter*, the court noted that "[a] finding of competency does not mean Defendant does not have cognitive deficits." 2013 WL 6668715, at *13. There, the defendant was withdrawn, had a low IQ, and was a simple thinker with a poor verbal memory and could be expected to have difficulty with complex hypothetical questions. *Id.* Despite these issues, including a low IQ, the defendant was found to be competent. *Id.*

In this instance, like *Glover* and *Carter*, Defendant has a low IQ—in the 12th percentile. (Doc. 23-1 at 3). Defendant's IQ is nevertheless much higher than the bottom one percentile of society which supported a finding of competency in *Glover.* 596 F.2d at 864-65. Moreover, like *Carter*, the record here does not demonstrate that Defendant's low IQ renders him incompetent to proceed. 2013 WL 6668715, at *13. Thus, the Undersigned finds that Defendant's low IQ does not prevent Defendant from adequately consulting with his attorney and assisting in his own defense or otherwise render him incompetent to proceed.

### iii.      Attention Deficits

The Undersigned next addresses Defendant's attention deficits. On this point, the experts agree that Defendant has attention deficits. In fact, these deficits appear to be severe.

For instance, Dr. Ouaou noted on the first evaluation that Defendant's processing speed on the WAIS-IV was in the second percentile. (Doc. 23-1 at 5). On the second evaluation, Defendant's performance was noted to be in the third percentile. (Doc. 124 at 4). Defendant also showed severe impairments for immediate memory span on both evaluations on the CVLT-II test. (Doc. 23-1 at 5; Doc. 124 at 4). Additionally, for focused and flexible attention, while Defendant only demonstrated mild impairment on the first evaluation, the second evaluation

showed severe impairment.  (Doc. 23-1 at 5; Doc. 124 at 4).  Dr. Ouaou also diagnosed Defendant with "severe" ADHD.  (Doc. 23-1 at 7; Doc. 124 at 6).

Similarly, Dr. Buigas' objective results also showed severe impairments in attention.  For instance, Defendant's results on the NAB-Attention Module from the first evaluation showed his attentional functioning to be in the "Moderately to Severely Impaired" range.  (Doc. 59 at 6). Moreover, Dr. Buigas diagnosed Defendant with "severe" ADHD after both evaluations.  (Doc. 59 at 8; Doc. 157 at 8).

Nevertheless, while Defendant may have severe attention deficits, there is no indication that Defendant's attention deficits render him mentally incompetent.  For instance, both experts testified that Defendant could be successfully redirected on topic when necessary.  (Doc. 202 at 136, 243).  Additionally, both experts testified that Defendant successfully completed all testing, although Dr. Ouaou stated that Defendant needed breaks.  (*Id.*).  Furthermore, notwithstanding the attention deficits Defendant may have, Dr. Buigas opined that Defendant is competent to stand trial.  (*See id.* at 214).

Moreover, while both experts diagnosed Defendant with "severe" ADHD, there is no indication that this diagnosis equates to incompetency.  Additionally, both experts testified that Defendant's attention deficits are amenable to treatment with medication.  (*Id.* at 141, 244). Indeed, Defendant concedes that his attention deficits may be treated with medication.  (Doc. 200 at 10).

Likewise, a review of relevant case law demonstrates that the presence of attention deficits does not necessarily equate to incompetency.  For instance, in *United States v. Dennis*, the defendant's expert diagnosed the defendant with mild mental retardation and ADHD.  No. 11-10250-EFM, 2012 WL 4794593, at *4 (D. Kan. Oct. 9, 2012).  Despite these diagnoses, the

court found that the defendant had not proved by a preponderance of the evidence that his impairments were so profound as to render him unable to effectively assist his counsel in presenting his defense. *Id.* Similarly, in *United States v. Kosow*, the defendant had been diagnosed and was being treated for bipolar disorder and ADHD. No. CRIM. 06-0228, 2007 WL 3033774, at *12 (W.D. Pa. Oct. 16, 2007), *aff'd*, 400 F. App'x 698 (3d Cir. 2010). Notwithstanding those diagnoses, the court found that defendant's ADHD and bipolar disorder did not – either alone or in combination with each other or his personality disorder – render him unable to assist his attorney in his defense. *Id.*

In this instance, like *Dennis*, Defendant's diagnoses of ADHD are insufficient evidence to prove his incompetency. *See Dennis*, 2012 WL 4794593, at *4. Instead, upon review, the Undersigned finds that a preponderance of the evidence shows that Defendant's attention deficits do not prevent him from consulting with counsel and assisting properly in his own defense. Specifically, the record shows that Defendant can be successfully redirected when necessary and that he can successfully complete tasks with breaks. Further, Dr. Buigas opined that Defendant is competent to stand trial, notwithstanding the attention deficits Defendant may have. (*See* Doc. 202 at 214). Moreover, as will be explained in greater detail below (*see* Discussion *infra* at Part V.C.2.v.), it is clear that Defendant's attention deficits do not prevent him from being able to assist his attorney in his defense even when considered in combination with his other impairments. *See Kosow*, 2007 WL 3033774, at *12.

Notwithstanding the findings discussed above, a finding of competency does not preclude the Court from providing certain accommodations. For instance, in *Glover*, the court found that Defendant could be competent to stand trial if questions, terms, and proceedings were explained to him in very simple terms, using concrete examples. 596 F.2d at 864-65. Similarly, the court

in *Carter* recommended simplifying and slowing down the proceedings and repeating information as needed, allowing ample time for defendant to ask and respond to questions, and allowing breaks for counsel to discuss information and developments with the defendant.  2013 WL 6668715, at *13.

Here, Defendant may be aided by accommodations such as frequent breaks, frequent redirection on topic, and additional time.  The specific accommodations necessary for Defendant, if any, can be addressed with the District Judge at the final pretrial status conference.  To be clear, the Undersigned finds that Defendant is competent to stand trial in this case even without accommodation.  Nonetheless, the Undersigned finds that providing accommodations at trial would aid Defendant in consulting with his lawyers and assisting properly with his defense at trial.

### iv.     Memory Deficits

The Undersigned next addresses whether Defendant's memory deficits affect his ability to assist counsel such that he is mentally incompetent to proceed.  *See* 18 U.S.C. § 4241(d).

On this point, Defendant contends that his memory deficits cannot be treated.  (Doc. 200 at 10).  Moreover, Defendant points to Dr. Ouaou's objective cognitive testing, which showed significant deficits in memory.  (Doc. 23-1 at 5; Doc. 124 at 4).  For instance, Defendant's results during both evaluations showed severe impairments for recall.  (Doc. 23-1 at 5; Doc. 124 at 4).  Further, Dr. Ouaou testified that Defendant has "bad memory."  (Doc. 202 at 58, 141).

Dr. Buigas' cognitive functioning testing measured, *inter alia*, areas related to memory.  (Doc. 59 at 6-7; Doc. 157 at 7).  For instance, during the first evaluation, Defendant took the NAB-Attention Module.  (Doc. 59 at 7).  This test includes a measure of working memory.  (*Id.*).  Defendant's scores for this measure were in the "Moderately to Severely Impaired" range.  (*Id.*).

On the second evaluation, it is unclear whether Dr. Buigas' cognitive functioning testing specifically tested for memory. (*See* Doc. 157).[5]

Dr. Buigas testified, however, that the results from both of his evaluations suggested that Defendant was malingering on cognitive testing. (Doc. 202 at 209). For instance, Defendant's scores on the BCT suggested that Defendant was specifically faking cognitive impairment resulting from a traumatic brain injury—the specific area Defendant puts at issue here. (*Id.* at 201-202). Additionally, other cognitive tests – including Defendant's VIP results (*id.* at 204), and the Category Test results (*id.* at 207) – showed malingering. The resulting inference from these test results is that Defendant was attempting to fake cognitive impairment—including his memory deficits because Dr. Buigas' cognitive testing included measures associated with memory.

Notwithstanding the objective test results related to memory discussed above, Defendant expressly tethers his memory deficits to his alleged "organic brain damage." (Doc. 200 at 10). As explained above, however, the Undersigned finds that Dr. Ouaou's diagnosis of Major Neurocognitive Disorder secondary to Traumatic Brain Injuries is not adequately supported by

---

[5] On this point, the Undersigned notes that Defendant narrowed the issues he argues to attention and memory. Nevertheless, neither expert narrowed the results from their respective cognitive testing to those two areas. Instead, the areas of attention and memory appear to be closely related to each other and to other areas of cognitive functioning. For instance, Dr. Ouaou addressed attention and memory separately in his cognitive testing. (Doc. 23-1 at 4-7). Attention is discussed with concentration in one category of the testing with subparts that include immediate memory span, focused and flexible attention, processing speed, and working memory. (*Id.* at 4-5). Memory is discussed with learning as another category of cognitive testing. (*Id.* at 5-7). Subparts of the learning/memory category include acquisition of new information, recall, recognition, spatial analysis/synthesis, and reasoning/problem solving/executive function. (*Id.*). For his part, Dr. Buigas addressed attention and memory together as one subpart of his cognitive functioning testing. (Doc. 59). In addition to attention and memory, other subparts of Dr. Buigas' cognitive functioning testing include executive functioning, language, processing speed, and motivation. (*Id.*).

the record.  (*See* Discussion *supra* at Part V.C.2.i.).  Because Defendant cannot show that he, in fact, suffered a traumatic brain injury meeting the DSM-5 criteria, Defendant's contention that he has significant memory impairments resulting from traumatic brain injury – that prevent him from having a sufficient present ability to consult with his attorney and assist in his own defense – is also not supported.

Furthermore, relevant case law demonstrates that memory deficits do not automatically render a defendant incompetent.  As stated above, in *Glover*, the defendant had an intelligence level at the lowest 1% of society, had memory problems, and suffered from a short attention span.  596 F.2d at 864-65.  Despite the memory problems, the district court's finding of competency was not overturned.  *Id.* at 867.  Similarly, in *Carter*, the defendant was withdrawn, had a low IQ, and was a simple thinker with a poor verbal memory and could be expected to have difficulty with complex hypothetical questions.  2013 WL 6668715, at *13.  Despite the issues with memory, the defendant was found to be competent.  *Id.*  Additionally, in *United States v. May*, the court acknowledged that a stroke and alcohol abuse left defendant with memory and information processing deficits but nevertheless found that those deficits did not render the defendant incompetent to stand trial.  475 F. Supp. 2d 1102, 1107 (D. Kan. 2007).  Likewise, in *United States v. Marsee*, the court acknowledged that a gunshot left the defendant with memory and information processing deficits, but the court found that those deficits did not render the defendant incompetent to stand trial.  No. 6:04-73-S-DCR, 2006 WL 1464788, at *6 (E.D. Ky. May 22, 2006).  Finally, in *United States v. Housh*, the court indicated that two automobile accidents left the defendant with memory and information processing deficits, but the court found defendant competent.  89 F. Supp. 2d 1227, 1231 (D. Kan. 2000).

Like the cases cited above, Defendant has some memory deficits. Nevertheless, as in the above-cited cases, the record here does not demonstrate that Defendant's condition is so severe as to render him incompetent to stand trial. Specifically, the record does not support Defendant's contention that he has memory deficits stemming from traumatic brain injury. Furthermore, Dr. Buigas found that Plaintiff is competent to proceed notwithstanding the memory deficits Defendant may have. (*See* Doc. 202 at 214). Thus, the Undersigned finds that the preponderance of the evidence shows that Defendant's condition is not so severe as to prevent him from consulting with counsel or assisting properly in his defense.

*v.*      *Impairments in Combination*

Finally, the Undersigned addresses all of Defendant's impairments in combination.

As the above-cited cases make clear, even a combination of deficits does not preclude a finding of competency. In *Glover* and *Carter*, the defendants had memory and attention issues and a low IQ. *See Glover*, 596 F.2d at 864-65; *Carter*, 2013 WL 6668715, at *13. Despite those issues, the courts in both cases determined that the defendants were competent to stand trial. *See Glover*, 596 F.2d at 864-65; *Carter*, 2013 WL 6668715, at *13. Similarly, in *Kosow*, the defendant had been diagnosed with bipolar disorder and ADHD, but the court found that these two conditions did not, either alone or in combination with each other or his personality disorder, render the defendant unable to assist an attorney in his defense. 2007 WL 3033774, at *12. Further, in *May*, *Marsee*, and *Housh*, the defendants suffered from memory and information processing deficits, but the courts in those cases found the defendants to be competent notwithstanding the combination of deficits. *See May*, 475 F. Supp. 2d at 1107; *Marsee*, 2006 WL 1464788, at *6; and *Housh*, 89 F. Supp. 2d at 1231.

Here, like the cases cited above, Defendant has a combination of deficits—*i.e.*, attention deficits, memory deficits, and a low IQ.  Nevertheless, the preponderance of the evidence shows that Defendant's condition is not so severe – even when considering the impairments in combination with each other – as to render him incompetent to stand trial.  *See, e.g.*, *Glover*, 596 F.2d at 864-65; *Carter*, 2013 WL 6668715, at *13.  In making this finding, the Undersigned specifically credits Dr. Buigas' opinion that Plaintiff is competent to proceed notwithstanding any deficits Defendant may have.  (*See* Doc. 202 at 214).

Additionally, as stated above, a finding of competency does not preclude the Court from providing accommodations.  Accommodations such as frequent breaks, frequent redirection on topic, and additional time may be beneficial to Defendant.  The specific accommodations necessary for Defendant, if any, can be addressed with the District Judge at the final pretrial status conference.  To be abundantly clear, however, the Undersigned finds that Defendant is competent to stand trial in this case even without accommodation.  Nonetheless, providing accommodations at trial would aid Defendant in consulting with his lawyers and assisting properly with his defense at trial.

## VI.    Conclusion

For the reasons articulated above following a *de novo* competency hearing and consideration of a fully developed evidentiary record that includes the additional medical records referenced in the Court's April 11, 2016 Order of referral (Doc. 107) and other evidence tendered by the parties and experts thereafter, the Undersigned finds that Defendant is competent and continues to **RESPECTFULLY RECOMMEND** that this action proceed to trial.

Respectfully recommended in Chambers in Fort Myers, Florida on May 16, 2017.

_____
MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:

Counsel of Record
Unrepresented Parties